HAROLD J. GREEN AND MARION F. GREEN, PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 29477–83.    Filed November 5, 1984.

*Bernard Wiczer* and *Fred R. Harbecke*, for the petitioners.
*Francis J. Emmons*, for the respondent.

OPINION

SIMPSON, *Judge*: This matter is before the Court on the Commissioner's motion for partial summary judgment pursuant to Rule 121, Tax Court Rules of Practice and Procedure.[1] The issues raised by the motion are: (1) Whether four "Exclusive License Agreements" executed by LaSala, Ltd. (LaSala), effected a sale of the four inventions covered thereunder to National Patent Development Corp. (NPDC) on the same day as such inventions were acquired by LaSala; (2) whether LaSala received a depreciable license or other asset in return for its sale of the licenses; (3) whether LaSala is entitled to claimed depreciation deductions with respect to such inventions if they were sold on the day they were acquired; and (4) whether LaSala is entitled to a deduction for research and experimental expenditures under section 174 of the Internal Revenue Code of 1954.[2]

The Commissioner determined the following deficiencies in the petitioners' Federal income taxes:

| Year | Deficiency | Addition to tax sec. 6653(a) |
|------|-----------|------------------------------|
| 1979 | $32,582.29 | $2,776.64 |
| 1980 | 38,508.63 | 2,635.94 |

The petitioners, Harold and Marion Green, husband and wife, maintained their legal residence in Chicago, IL, at the time they filed their petition in this case. They filed their joint Federal income tax returns for 1979 and 1980 with either the Office of the District Director in Chicago, IL, or with the Internal Revenue Service Center, Kansas City, MO. Mr. Green will sometimes be referred to as the petitioner.

LaSala was organized as an Illinois limited partnership on December 29, 1977. It was reorganized and expanded on

---

[1] Any reference to a Rule is to the Tax Court Rules of Practice and Procedure.

[2] All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

December 19, 1979, for the stated purpose of acquiring four inventions for investment and income-producing purposes and to thereafter patent, improve, maintain, and exploit the inventions. Tower Hill Co., Inc. (Tower Hill), an Illinois corporation organized on November 30, 1979, became the general partner of LaSala in the reorganization.

As reorganized, LaSala had 25 "limited partnership units" with a subscription price (payable in three annual installments) of $55,000 per unit. No further capital contributions could be required of a limited partner. The general partner was required to make a $1,000 capital contribution. According to projections contained in the partnership's "Confidential Private Offering Memorandum," the partnership's entire capital of $1,376,000 was to be expended in the partnership's first 25 months of operation as follows:

|  | *1979* | *1980* | *1981* |
|---|---|---|---|
| *Capital contributions* | | | |
| Limited partners | $500,000 | $437,500 | $437,500 |
| General partner | 1,000 | - - - | - - - |
| Total | 501,000 | 437,500 | 437,500 |
| *Use of contributed capital* | | | |
| For acquisition of inventions | 12,500 | 12,500 | 12,500 |
| Research and development | 200,000 | 225,000 | 225,000 |
| General partner's annual management fee | 75,000 | 75,000 | 75,000 |
| General partner's organization fee | 40,000 | - - - | 30,000 |
| Legal fees | 63,000 | 30,000 | 30,000 |
| Accounting fees | 57,000 | 65,000 | 50,000 |
| Offeree representative fees | 45,000 | 30,000 | 15,000 |
| Miscellaneous costs | 8,500 | - - - | - - - |
| Total | 501,000 | 437,500 | 437,500 |

The petitioner subscribed for .75 of a limited partnership unit on December 27, 1979. He acquired his interest with an immediate cash contribution of $15,000 and a non-interest-bearing note of $26,250, payable in two installments of $13,125 each on August 1, 1980, and August 1, 1981. The petitioner paid the installments as they became due and remained a limited partner in LaSala through at least 1982.

LaSala's general partner, Tower Hill, had the sole and exclusive power to operate and manage the business of the partnership. Tower Hill had no previous experience in the acquisition and exploitation of inventions as its position as general partner of LaSala was its first corporate undertaking. The principal officers of Tower Hill, president Alex Pinsky and secretary-treasurer Zalmon Horn, had previously participated in the structuring of limited partnership offerings and had experience in the review and analysis of tax-sheltered investments in real estate, warehouses, and research and development ventures.

On or about December 24, 1979,[3] LaSala entered into four sets of agreements, each set concerning one of four inventions acquired by the partnership. Each set included three separate agreements: (1) An acquisition agreement, (2) a research and development agreement (R & D agreement), and (3) an exclusive license agreement (license agreement). The sets of agreements are virtually identical, the principal distinctions being the inventor, the invention, and the amount of the consideration covered by each set of agreements.

Each acquisition agreement was entered into between LaSala and an inventor and, by its terms, conveyed to the partnership all the inventor's right, title, and interest in his invention or inventions, including any patent rights. Of the four inventions thus acquired, none was patented as of December 24, 1979, although at least one had a patent application pending.

The stated purchase price of each invention was payable in installments. The due dates and amounts of such installments were as follows:

Inventor and Invention

| Due date | Dr. John Troll | | Dr. C.K. Kliment | Mr. J. Barrows |
|---|---|---|---|---|
| | Wind power system | Contact lens system | Hydrophilic gels | Cleansing bar |
| 12/31/79 | $5,000 | $2,500 | $2,500 | $2,500 |
| 10/ 1/80 | 5,000 | 2,500 | 2,500 | 2,500 |
| 10/ 1/81 | 5,000 | 2,500 | 2,500 | 2,500 |

[3]Each of the 12 agreements states that it was entered into on Dec. 24, 1979, but in each instance, the partnership's signature is dated Dec. 29, 1979. The exact date of execution is of no relevance to the present motion as the parties have agreed that each set of agreements was entered into on the same day.

Inventor and Invention

| Due date | Dr. John Troll | | Dr. C.K. Kliment | Mr. J. Barrows |
|---|---|---|---|---|
| | Wind power system | Contact lens system | Hydrophilic gels | Cleansing bar |
| 4/30/83 | $250,000 | $200,000 | $200,000 | $200,000 |
| 4/30/84 | 500,000 | 250,000 | 250,000 | 250,000 |
| 4/30/85 | 750,000 | 300,000 | 300,000 | 300,000 |
| 4/30/86 | 750,000 | 250,000 | 250,000 | 250,000 |
| 4/30/87 | 650,000 | 250,000 | 250,000 | 250,000 |
| 4/30/88 | 410,000 | 200,000 | 200,000 | 200,000 |
| 4/30/89 | 750,000 | 117,500 | 117,500 | 117,500 |
| Total | 4,075,000 | 1,575,000 | 1,575,000 | 1,575,000 |

Of the aggregated purchase price of $8.8 million only $37,500 (the total of payments due in 1979, 1980, and 1981) was payable in all events. The payments due during the 7-year period commencing April 30, 1983, were on a nonrecourse obligation of the partnership payable only out of the "value realized pursuant to the exploitation of the Patent Rights by the Purchaser, or its Assignee or Licensee." The inventor's sole remedy in the event of nonpayment was to foreclose against the invention. However, the inventor's right to foreclose would be deferred if the invention, upon commercial exploitation, failed to achieve sales equal to certain "net sales levels" warranted by the inventor. LaSala undertook in each agreement "to exercise the rights herein granted, to promote the use and sale of the products derived therefrom and satisfy all bona fide demands for said products so long as such undertakings may be commercially feasible."

On the same day as it entered into the acquisition agreements, LaSala entered into four R & D agreements with NPDC. NPDC was a patent development company engaged in activities worldwide. It had been in existence for more than 20 years, and its stock was traded on the American Stock Exchange.

The amounts to be paid to NPDC for its services varied with the agreements. In the case of the more expensive invention, the wind power system, NPDC was to receive $305,000, payable in installments of $95,000 on or before December 31, 1979, $105,000 on or before October 1, 1980, and $105,000 on or before October 1, 1981. Under each of the remaining three agreements, NPDC was to receive $115,000, payable in install-

ments of $35,000 on or before December 31, 1979, $40,000 on or before October 1, 1980, and $40,000 on or before October 1, 1981.

In return for such payments, NPDC agreed to provide research and experimental services, systems analysis, and technical documentation "as are reasonably necessary and customary to develop the Product into a commercially viable, marketable product or process." NPDC further agreed to furnish LaSala with quarterly progress reports of functions performed, changes in personnel or subcontractors, and funds expended, and agreed to confer with representatives of LaSala to explain such progress reports. All product development was to be "at the Client's risk," and NPDC expressly disclaimed any warranty to the effect that the invention would be "developed into a commercially viable, marketable product or process of any economic utility." NPDC did represent that it would "extend its best efforts, within the resources * * * provided, to accomplish the objectives stated." The research and development services were to commence immediately upon execution of the agreement and to terminate by October 1, 1981, regardless of whether development had been completed.

The R & D agreement gave LaSala no power to supervise, review, or direct the activities of NPDC with respect to the inventions. LaSala's sole remedy, in the event that NPDC breached an obligation of the agreement, was to terminate the agreement and sue for breach of contract.

As with the R & D agreements, the four license agreements were all made with NPDC and are all dated December 24, 1979. The agreements are generally identical in their terms. The pertinent provisions of the license agreements read as follows:

WHEREAS, the Owner is the owner of certain patented and unpatented technological inventions, ideas, conceptions and an application for patent (the "Patent Rights" or the "Products") as described in Exhibit A, Patent Agreement, attached hereto, which was acquired from the creator or inventor, in accordance with the terms of such Patent Agreement; and

WHEREAS, the Owner is in the process of having the Products further developed in accordance with the terms of a Research and Development contract, Exhibit B; and

WHEREAS, the Owner desires to have the Products commercialized following their development by means of granting an exclusive license to Licensee; and

WHEREAS, the Licensee desires to acquire the exclusive license to commercialize the Products.

Now, THEREFORE, the parties hereto covenant and agree as follows:

1. *Exclusive License.* Subject to the Patent Agreement, Exhibit A, the Owner hereby grants to the Licensee the exclusive worldwide right and license to enjoy, commercialize, manufacture, use, sell and exploit the Products, including:

(a) The right to grant sublicenses on such terms as are not violative of any provisions of this Agreement.

(b) All inventions, improvements, patent applications, or patents which the Licensor now owns or controls or hereafter owns or controls relating to the subject matter of this Agreement, subject to the provisions of Exhibits A and B attached hereto.

(c) The furnishing to the Licensee or its nominees with the necessary blueprints, working drawings, and all other data and information necessary for the manufacture of the Product to the extent available or received by Owner from the creator of the Product or the Developer described in Exhibit B.

\*     \*     \*     \*     \*     \*     \*

4. *Additional Patent Applications.* After the Owner has provided all necessary information, drawings, blueprints, and all other necessary data and has executed all necessary papers, documents, and instruments, the Licensee shall cause to be prepared, filed, and prosecuted at its own expense and with the least possible delay, an application or applications for letters patent of the United States on all improvements hereafter made by the Owner, Licensee, or sublicensees as selected by the Licensee, as well as corresponding applications for letters patent in such foreign countries as may be deemed advisable by mutual consent of Owner and Licensee, unless the Licensee has notified Owner that such course is inadvisable, and the Owner does not thereafter make written demand upon the Licensee that it proceed with the application for letters patent on the Product and/or any improvements thereto. If Licensee fails to comply with Owner's demand within sixty (60) days, Owner my proceed with any filings of patent applications at its own expense. \* \* \*

5. *Ownership of Patents.* All patents shall be the exclusive property of the Owner, subject to the exclusive license hereby granted. The Owner shall, upon demand, execute and deliver to the Licensee such documents as may reasonably be deemed necessary or advisable by counsel for the Licensee for filing in the appropriate patent offices to evidence the granting of the exclusive license hereby given.

6. *Royalties.* The Licensee shall make annual payments to the Owner of a fixed royalty equal to the product obtained by multiplying twenty-five percent (25) times each year's Applicable Percentage of net revenue realized by Licensee under this license and under any sub-licenses which may be

granted by the Licensee (hereinafter referred [to] as "earned fixed royalties"), but only with respect to revenue realized during the term for which Patent Rights are granted hereunder, including, without limitation, anytime during which such Patent is in pending status. The terms [sic] "net revenue realized" shall mean total income derived from the sales of the Product or fees, royalties, or other income earned from the sublicensing of the Product or Patent Rights or any item, process or product protected thereby. The term "sales" shall mean gross sales of the Licensee or any sub-licensee less returns, allowances, trade discounts and transportations. * * *

The Applicable Percentage of net revenue for each year is as follows:

| License years | Applicable percentage |
|---|---|
| 1979 | 100% |
| 1980 | 87.5 |
| 1981 | 69.0 |
| 1982 | 50.5 |
| 1983 | 42 |
| 1984 | 35 |
| 1985 | 28 |
| 1986 | 21 |
| 1987 | 14 |
| 1988 | 7 |
| 1989 and thereafter | 0 |

In addition to the earned fixed royalty to be paid by the Licensee as described above, the Licensee shall pay an annual participating royalty to the Owner in an amount equal to the product obtained by multiplying the Applicable Percentage times twenty-five percent (25%) of the net income derived by the Licensee from license activities of the Product after deduction of the earned fixed royalty. For purposes of determining net income as a basis for the participating royalty, said amount shall be determined on a calendar year basis in accordance with generally accepted accounting principles and shall be in an amount equal to the difference between the net revenue realized and the sum of all direct and indirect expenses incurred in connection with the license activities related to the Products.

\* \* \* \* \* \* \*

In the event the net income computation results in a net loss for the taxable year for purposes of determining the participation royalty, the current earned fixed royalty with respect to related Products and all future fixed and participating royalties shall be reduced by the "net loss offset". The term "net loss offset" shall be an amount equal to the product obtained by multiplying the Applicable Percentage times twenty-five percent (25%) of the net loss for the calendar year; provided, however, the net loss offset as computed for any taxable year plus the sum of all net loss offsets carried

forward from prior years cannot exceed forty-five percent (45%) of the fixed royalty payable for the current taxable year.

\*     \*     \*     \*     \*     \*     \*

8. *Term.* This Agreement shall continue until any of the letters patent on the Product, including related processes and apparatus, have been granted, and thereafter during the life of any such letters patent issued by the United States or any foreign country, notwithstanding the prior termination of the Licensee's royalty obligation. However, this Agreement is subject to the following:

(a) The Licensee may at any time, upon six (6) months' written notice to the Owner, terminate this Agreement, without prejudice, however, to the moneys due to the Owner; provided that: (i) such termination may not become effective prior to January 1, 1982; and (ii) aggregate royalties earned by the Owner were less than Fifteen Thousand Dollars ($15,000) for the most recent calendar year.

(b) The Owner shall have the right to terminate this Agreement upon giving notice to the Licensee at least thirty (30) days before the time when such termination is to take effect \* \* \* if:

(i) the royalty payments are in arrears for thirty (30) days after the due date, and if thereupon notice of default is given to the Licensee and payment remains in arrears for an additional thirty (30) days after the giving of such notice; or

(ii) the Licensee defaults in performing any of the other terms of this Agreement and continues in default for a period of thirty (30) days after written notice thereof; or

(iii) the Licensee is adjudicated bankrupt or insolvent, or enters into a composition with its creditors, or if Licensee suffers a receiver to be appointed for it.

(c) The Owner may, at any time, upon six (6) months' written notice to the Licensee terminate this Agreement, without prejudice, however, to the moneys due to the Owner, with respect to any foreign country designated by the Owner, provided that:

(i) such termination will not be effective prior to January 1, 1982; and

(ii) aggregate royalties earned by the Owner with respect to said foreign country were less than Three Thousand Dollars ($3,000) for the most recent calendar year.

(d) Upon termination under subdivisions (a), (b), or (c) of this paragraph, the Licensee shall duly account to the Owner and transfer to it all rights which it may have to the patents, inventions, processes, and apparatus, together with all its trade names and trademarks in respect thereof, and all rights to any sub-license or sub-licenses which may have been granted pursuant to the terms hereof.

\*     \*     \*     \*     \*     \*     \*

10. *New Inventions.* If during the continuance of this license, the owner makes any further improvements of the Product or the mode of using it, or becomes the owner of any such improvements either through patents or

otherwise, then it shall communicate such improvements to the Licensee and give the Licensee full information regarding the mode of using them and the Licensee shall be entitled to use the same along with all rights which are hereby granted to the Licensee in respect to the above mentioned inventions described in paragraph 1. The improvement shall be considered part of the Product and shall not be the subject of any separate royalty payable to the Owner.

\* \* \* \* \* \* \*

13. *Representations by Licensee.* The Licensee warrants and represents to the Owner, its successors and assigns (which warranties and representation shall survive the closing of this transaction regardless of what investigations the Owner may have made with respect thereto prior to the closing) as follows:

(a) The Licensee has or can acquire the technical know-how and skill required to commercialize the Product;

(b) The Licensee will, immediately upon the execution of the Agreement and thereafter during the term of this Agreement, exert its best efforts to commercialize the Product;

\* \* \* \* \* \* \*

15. *Assignment.* Except as otherwise expressly stated in this Agreement, Licensee may not assign the Patent Rights or any rights hereunder without the written consent of the Owner. \* \* \*

The only variation in the terms of the four agreements was the royalty termination date. LaSala's royalty rights would terminate on April 30, 1987, with respect to the two inventions purchased from Dr. Troll, on April 30, 1988, with respect to the invention purchased from Mr. Barrows, and on April 30, 1989, with respect to the invention purchased from Dr. Kliment. The royalty termination date in each license agreement corresponds exactly with the deferred foreclosure date under the related acquisition agreement.

During the years 1979 through 1981, LaSala paid a total of $650,000 to NPDC pursuant to the terms of the four R & D agreements: $200,000 was paid in 1979, $225,000 was paid in 1980, and $225,000 was paid in 1981. During the same years, LaSala received no royalties from commercial exploitation of the inventions by NPDC.

The partnership's Federal tax returns were filed on a calendar year basis and were prepared by use of the accrual method of accounting. The following is a summary of the

income and expenses reported on the partnership's returns for 1979, 1980, and 1981[4]:

|  | 1979 | 1980 | 1981 |
|---|---|---|---|
| Gross receipts | - - - | - - - | - - - |
| Expenses: | | | |
| Amortization of inventions | $1,100,125 | $1,628,185 | $1,628,185 |
| Research and experimental | 650,000 | - - - | - - - |
| Other expenses | 261,344 | 143,113 | 141,793 |
| Total | 2,011,469 | 1,771,298 | 1,769,978 |
| Net loss | (2,011,469) | (1,771,298) | (1,769,978) |

The partnership claimed a depreciable cost basis in the inventions of $8,801,000, computed by adding together the stated purchase prices called for in each of the four acquisition agreements, and allocating $1,000 of the partnership's legal fees to them. The depreciation claimed for each of the 3 years was calculated by multiplying such cost basis by the year's percentage decline in the "applicable percentage" called for in the licensing agreements, i.e., 12.5-percent decline in 1979, 18.5-percent decline in 1980, and 18.5-percent decline in 1981. The research and experimental expenditure deduction of $650,000 in 1979 was calculated by accruing and expensing in such year the fees due NPDC in 1979, 1980, and 1981, under the terms of the four R & D agreements.

On their Federal income tax returns for 1979 and 1980, the petitioners claimed loss deductions attributable to the operation of LaSala. In his notice of deficiency, and by amendment of his answer, the Commissioner has disallowed the entire amount of such deductions. However, his motion for partial summary judgment is addressed only to the partnership's claimed deductions for depreciation and research and experimental expenses.

Rule 121(b) provides that a decision may be rendered on a motion for summary judgment if it is shown "that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law. A partial summary adjudication may be made which does not dispose of all the issues in

---

[4]LaSala reported interest income of $314 on its 1982 partnership return, all of which income was offset by deductions of $283 for amortization and $31 for bank service charges.

the case." The factual materials presented and the inferences to be drawn from such materials "must be viewed in the light most favorable to the party opposing the motion." *Jacklin v. Commissioner*, 79 T.C. 340, 344 (1982), and cases cited therein. However, a motion for summary judgment may not be defeated by the mere allegation that there is a dispute over a material fact; the adverse party must set forth specific facts showing that there is a genuine issue for trial. Rule 121(d); see *First National Bank v. Cities Service Co.*, 391 U.S. 253, 288–290 (1968); *Wilson Jones Co. v. Gilbert & Bennett Mfg. Co.*, 332 F.2d 216, 219 (2d Cir. 1964).

In support of his motion, the Commissioner relies on certain documentary evidence[5] and admitted allegations in the pleadings. For purposes of this motion only, he accepts the assertions contained in such documents as true and concedes that the partnership entered into the transactions related therein with a profit motive.

The first issue is whether the four license agreements between LaSala and NPDC effected sales of the partnership's interest in the inventions on the same day as such inventions were acquired by LaSala. A sale (or assignment) of patent rights occurs when the owner of such patent rights transfers all of his substantial rights in them. *Glen O'Brien Partition Co. v. Commissioner*, 70 T.C. 492 (1978); *Newton Insert Co. v. Commissioner*, 61 T.C. 570 (1974), affd. per curiam 545 F.2d 1259 (9th Cir. 1976). It is unnecessary that a patent or patent application be in existence in order to effect a transfer of all substantial rights in the underlying invention. *Glen O'Brien Partition Co. v. Commissioner, supra* at 500; *Estate of Laurent v. Commissioner*, 34 T.C. 385, 399 (1960).

---

[5]The petitioners object to some of the documents on the grounds that they either are irrelevant to the issues presented in this motion or are the basis for improper supposition and inference by the Commissioner as to the partnership's intent. However, the petitioners have failed to go beyond this general objection and have failed to specify their particular objection to any document.

Moreover, the standard of relevancy is broad: " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401 (applicable to the Tax Court under sec. 7453 and Rule 143(a)). To the extent that we rely upon any document contained in the record before us, we find that such document is relevant to establishing the underlying factual or procedural posture of this case or to deciding one of the specific issues presented in this motion. Furthermore, while we agree that summary judgment is inappropriate where the parties seek to draw inferences dealing with questions of motive and intent (see *Espinoza v. Commissioner*, 78 T.C. 412, 417 (1982)), the resolution of this motion does not require that we draw such inferences.

Whether an agreement transferring a particular right or interest in an invention is a sale or a license does not depend upon the name by which it calls itself but upon the legal effect of its provisions. *Waterman v. MacKenzie,* 138 U.S. 252, 256 (1891); *Newton Insert Co. v. Commissioner,* 61 T.C. at 579; *Myers v. Commissioner,* 6 T.C. 258, 264 (1946). The terminology used in the agreement may be of great importance (*Pickren v. United States,* 378 F.2d 595, 600 (5th Cir. 1967)), but if the meaning of the agreement is not plain and its terms are ambiguous, we must examine the purposes of the agreement and the surrounding circumstances in order to determine if a sale was mutually intended. *Pickren v. United States, supra* at 599-600; *Glen O'Brien Partition Co. v. Commissioner, supra* at 500; *Reid v. Commissioner,* 26 T.C. 622, 632 (1956).

A long line of cases has established that the grant, for consideration, of an exclusive right to "manufacture, use, and sell" an invention for the duration of the patent term constitutes a sale of the grantor's substantial rights in the invention. *Merck & Co. v. Smith,* 261 F.2d 162 (3d Cir. 1958); *Massey v. United States,* 226 F.2d 724 (7th Cir. 1955); *Watson v. United States,* 222 F.2d 689 (10th Cir. 1955); *Newton Insert Co. v. Commissioner, supra; Coplan v. Commissioner,* 28 T.C. 1189 (1957); *Champayne v. Commissioner,* 26 T.C. 634 (1956); *Myers v. Commissioner, supra.* This well-established principle is derived from the Supreme Court case of *Waterman v. MacKenzie, supra,* a patent law rather than a tax law case. The Supreme Court found that a patent consists of the exclusive right "to make, use, and vend" the invention throughout the United States and its territories for the term of 17 years. It held, therefore, that to qualify as an assignment which passes title to a patent rather than as a "mere license," a transfer has to convey either (a) the whole patent, comprising the exclusive right to make, use, and vend the invention throughout the United States; or (b) an undivided part or share of the whole patent; or (c) the exclusive right under the patent within and throughout a specified part of the United States. 138 U.S. at 255.

In the present case, LaSala, through the appropriate terms of art, unequivocally conveyed to NPDC all of its substantial rights in the four inventions. The license agreements granted NPDC "the exclusive worldwide right and license to enjoy,

commercialize, manufacture, use, sell and exploit the Products," including all improvements, patent applications, and patents which LaSala then owned or subsequently acquired, until the expiration of any patent acquired. These terms are identical in impact to the language stated in *Waterman* to be necessary to effect the sale of a patent.

The petitioners do not contest that the grant of an exclusive right to manufacture, use, and sell an invention for the life of the patent constitutes a sale or exchange for tax purposes. However, they contend that the parties to the license agreements intended that the development of the inventions into commercially exploitable products be a condition precedent to the effectiveness of the license agreements, and that LaSala therefore did not sell the inventions on the same day as it acquired them. Alternatively, the petitioners maintain that the license agreements effected an exchange of LaSala's patent interests for licenses, an intangible depreciable asset.

With respect to the petitioners' contention that development of the inventions was intended to be a condition precedent, the existence or nonexistence of such intent is said to be a material issue of fact requiring a trial. Rule 121(d) requires that the party opposing a motion for summary judgment set forth specific facts showing that there is a genuine issue for trial. However, the petitioners have not, by means of an affidavit or otherwise, offered to establish the parties' intent through trial testimony. In fact, they maintain that such intent can be inferred from certain provisions and statements contained in the license, R & D, and acquisition agreements. We therefore conclude that the petitioners have wholly failed to show that a trial is necessary to establish the parties' intent, since the agreements themselves are before us.

Looking first to the terms of the license agreements themselves, the petitioners maintain that the numbered paragraphs therein are ambiguous as to the effective date of the contract. To clear up this perceived ambiguity, the petitioners look to an even vaguer statement in the recitals preceding such paragraphs. Specifically, they point to that portion of the recitals which states:

WHEREAS, the Owner is in the process of having the Products further developed in accordance with the terms of a Research and Development contract, * ʰ * and

WHEREAS, the Owner desires to have the Products commercialized *following their development* by means of granting an exclusive license to Licensee; * * * [Emphasis added.]

These recitals, particularly the italicized portion thereof, are said to lead to the conclusion that the partnership intended to retain dominion and control over the inventions throughout the development stage and that NPDC intended to become obligated only if and when a marketable invention had been developed.

We find the license agreements to be unambiguous. Although the agreements do not specifically state the date on which they become effective, several provisions therein clearly indicate that the parties intended that the agreement be immediately effective. For instance, paragraph 1 provides: "Subject to the Patent Agreement, * * * the Owner *hereby grants* to the Licensee the exclusive worldwide right and license." Paragraph 1(b) designates the items covered by the agreements as follows: "All inventions, improvements, patent applications, or patents which the Licensor *now* owns or controls *or hereafter* owns or controls." Paragraph 5 states: "All patents shall be the exclusive property of the Owner, subject to the exclusive license *hereby granted*." The "Term" provision of the agreements, paragraph 8, expressly provides that "This Agreement *shall continue* until any of the letters patent on the Product, including related processes and apparatus, have been granted, and *thereafter* during the life of any such letters patent." Finally, in paragraph 13(b), NPDC represents that it "will, *immediately upon the execution of this Agreement* and thereafter during the term of this Agreement, exert its best efforts to commercialize the Product." (Emphasis added to all cited passages in this paragraph.) The inescapable conclusion reached from reading the quoted passages is that immediately upon the execution of the agreements, NPDC received the right to exploit the inventions and any improvements or patents derived therefrom and concurrently assumed the obligation to immediately attempt to commercialize the products. Because the operative provisions of the agreements clearly express the parties' intentions, it is unnecessary to resort to the vague recitals preceding the agreements. Nevertheless, we observe that such recitals are consistent with an intention to effect an immediate transfer of the inventions.

.

Other provisions of the license agreements support our conclusion that the agreements were intended to be immediately effective. Paragraph 6, dealing with royalties, includes an "applicable percentage" for 1979 and 1980. This provision would be meaningless if NPDC had no obligation to exploit the inventions until some unknown future date. Similarly, paragraph 8 limits both parties' right to terminate the agreements prior to January 1, 1982. No purpose would be served by such limitation if the agreements were not intended to be immediately operative.

The petitioners also maintain that the license, acquisition, and R & D agreements, viewed together, express the intention of the parties thereto that development of the inventions be a condition precedent to the effectiveness of the licenses. The petitioners point to paragraph 1(b) of the license agreements, which provides that NPDC was granted rights to the inventions "subject to" the provisions of the acquisition and R & D agreements. They further contend that under the R & D agreements, the partnership retained the power to "supervise, review, and direct" NPDC's research and development activities with respect to the inventions. Consequently, they conclude that since the license agreements were "subject to" this retained control over development, they could not be effective until the development was completed.

The petitioners' line of reasoning distorts the meaning of the cited passage and also presupposes a power over the development activities that simply does not exist. The obvious purpose for the reference in the license agreements to the acquisition and R and D agreements is that the license agreements purported to convey only that interest in the inventions which the partnership actually possessed. If the partnership failed to make its "deferred" payments under the terms of the acquisition agreements, the inventors would eventually have the right to foreclose upon the inventions. To avoid a breach of contract under such circumstances, it was necessary to make the license agreements "subject to" the acquisition agreements. Similarly, the license agreements, which were exclusive, had to be made "subject to" the R & D agreements which gave NPDC, as developer, the right to work with the inventions. It is also clear to us that LaSala retained no power to "supervise, review, and direct" the work of NPDC. Nothing in

the R & D agreements bestows such a power on LaSala. LaSala was entitled only to progress reports and, if LaSala desired, to an interview with representatives of NPDC to discuss such reports. That LaSala's general partner may have, in fact, as an affidavit of Mr. Pinsky attests, received and reviewed progress reports and met with NPDC to discuss NPDC's development activities, does not mean that LaSala had the power to control such activities; even more clearly, such fact is insufficient to show that the development was a condition precedent to the effectiveness of the license agreements.

In connection with the petitioners' alternative argument that they received a license in exchange for the transfer of their rights to the inventions, they contend that such licenses are depreciable assets in the hands of LaSala. However, the petitioners have failed to explain what the "license" is that they received in the "exchange." We have found that under the terms of the license agreements, LaSala parted with its substantial rights in the inventions by transferring to NPDC an exclusive right to "make, use, and sell" the inventions for the duration of their patent lives. Such an exclusive transfer excluded the transferor from utilizing the invention. *Merck & Co. v. Smith*, 261 F.2d at 164. Therefore, LaSala did not retain a "license" in the inventions under the license agreements.

The only thing LaSala received in return for the transfer of its interest was the right to receive the purchase price of the inventions, in the form of royalty payments based upon sales of the commercialized inventions. Neither the petitioners' nor our own research has turned up any case holding that an owner who relinquishes all his substantial rights in an invention or patent is thereafter entitled to a depreciation deduction.

The reason for the lack of cases is obvious. Section 167(a) provides in pertinent part:

There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—
  (1) of property used in the trade or business, or
  (2) of property held for the production of income.

When the owner of patent rights relinquishes such rights, whether in return for a lump sum, installments of a fixed sum,

or royalties based on use or sales, he recovers his basis, if any, in the sale. See secs. 1001, 1222, 1235(a); *Burde v. Commissioner*, 43 T.C. 252 (1964), affd. 352 F.2d 995 (2d Cir. 1965); *Myers v. Commissioner*, 6 T.C. at 258; *Winchester v. Commissioner*, 27 B.T.A. 798 (1933). After the transfer, he no longer owns any property of a character subject to "exhaustion, wear and tear," nor does he require a "reasonable allowance" for depreciation to recover his basis in the patents. Cf. *Newton Insert Co. v. Commissioner*, 61 T.C. at 570 (where transferor has conveyed his substantial rights in a patent, transfer is a sale, and transferee is entitled to depreciation); *Best Lock Corp. v. Commissioner*, 31 T.C. 1217 (1959); *Associated Patentees, Inc. v. Commissioner*, 4 T.C. 979 (1945).

LaSala, having sold its rights in the inventions simultaneously with its acquisition of such rights, neither "used" such rights in a trade or business, nor "held" such rights for the production of income, within the meaning of section 167(a). Consequently, we hold that LaSala was not entitled to any depreciation deduction with respect to such inventions.[6]

The next issue for decision is whether LaSala is entitled to a deduction for research and experimental expenditures for 1979. Section 174(a)(1) states, as a general rule, that "research or experimental expenditures which are paid or incurred by * * * [a taxpayer] during the taxable year in connection with his trade or business," may, at the election of the taxpayer, be treated as expenses not chargeable to capital account and, therefore, may be deducted in the taxable year. The provisions of section 174(a)(1) "apply not only to costs paid or incurred by the taxpayer for research or experimentation undertaken directly by him but also to expenditures paid or incurred for research or experimentation carried on in his behalf by another person or organization (such as a research institute, foundation, engineering company, or similar contractor)." Sec. 1.174–2 (a)(2), Income Tax Regs.

The Commissioner asserts that LaSala's expenditure of $650,000 under the R & D agreements was not "in connection with" any trade or business because LaSala was never intended to enter into, nor financially capable of carrying on, an

---

[6]We express no opinion as to the amount, character, or timing of any gain or loss recognizable on the sale of the four inventions by LaSala since such issue was not included in the Commissioner's motion for partial summary judgment.

active trade or business. Additionally, he asserts that the research payments were not expended "in * * * [LaSala's] behalf" because LaSala had divested itself of ownership of the inventions. The petitioners contend that, even if a sale of the inventions occurred in December 1979, LaSala's role with regard to the development of the inventions was sufficient under *Snow v. Commissioner*, 416 U.S. 500 (1974), and *Cleveland v. Commissioner*, 297 F.2d 169 (4th Cir. 1961), to qualify as being "in connection with" a trade or business, and further that LaSala's interest in future royalties is sufficient in itself to mean that NPDC conducted the development activities on LaSala's behalf.

Prior to the Supreme Court's decision in *Snow*, this Court had taken the position that expenditures for research and experimentation had to be made in connection with an existing business to which such research and experimentation was proximately related in order to be deductible under section 174(a)(1). *Best Universal Lock Co. v. Commissioner*, 45 T.C. 1 (1965); *Koons v. Commissioner*, 35 T.C. 1092 (1961). Research expenditures by a taxpayer not currently engaged in a trade or business were held to be nondeductible, pre-operating expenses. *Koons v. Commissioner, supra*.

In *Snow v. Commissioner*, 416 U.S. 500 (1974), revg. 482 F.2d 1029 (6th Cir. 1973), affg. 58 T.C. 585 (1972), Mr. Snow was an executive with Procter & Gamble Co. In 1966, he contributed $10,000 for a 4-percent interest in Burns Investment Co. (Burns), a limited partnership formed to develop an unpatented trash-burning device. Mr. Trott was the general partner of the partnership and the inventor of the trash burner. Mr. Trott conveyed all his rights in the invention to the partnership. During 1966, Burns had no manufacturing plant or office. Development of the burner began in that year and was conducted by a company owned by Mr. Trott on behalf of the partnership. No patent was applied for until 1968, and Burns made no effort to market or sell the device in 1966. The Tax Court held that the taxpayer was not entitled to deduct a distributive share of his partnership's research expenses in 1966 because the partnership was not then engaged in a trade or business and the research was not related to the taxpayer's own trade or business. 58 T.C. at 597.

In determining that the partnership's research expenditures in *Snow* were not made "in connection with a trade or business," we applied the facts and circumstances test of section 162, as announced in *Higgins v. Commissioner*, 312 U.S. 212 (1941). 58 T.C. at 594. However, one factor was given particular weight, and that was the fact that the partnership had made no sales of any product either before or during 1966. 58 T.C. at 594–596. We cited with approval the concurring opinion of Justice Frankfurter in *Deputy v. du Pont*, 308 U.S. 488, 499 (1940), wherein he maintained that carrying on any trade or business (for purposes of the predecessor of section 162) "involves holding one's self out to others as engaged in the selling of goods or services." 58 T.C. at 594. The Sixth Circuit affirmed our conclusion that the partnership's expenditures were pre-operating expenses and therefore nondeductible under section 174. 482 F.2d at 1029, 1032.

The Supreme Court reversed and stated that the meaning of the phrase "in connection with a trade or business" used in section 174 should not be limited by other restrictive definitions of "trade or business" which had been suggested for other sections of the Code. The Court specifically disclaimed the restrictive test of a trade or business advanced by Justice Frankfurter in *Deputy v. du Pont, supra,* as inappropriate to the purpose of section 174. 416 U.S. at 502–503. Section 174 is intended to encourage research and experimentation by "small or pioneering business enterprises," as well as by established, ongoing businesses. A trade or business test under section 174 which depended upon the existence of production or sales of the invention "would defeat the congressional purpose somewhat to equalize the tax benefits of the ongoing companies and those that are upcoming and about to reach the market." 416 U.S. at 504. Therefore, the Court held that the partnership was entitled to a deduction under section 174 even though it had not yet had any sales.

Although the Supreme Court established in *Snow* that the taxpayer need not currently be producing or selling any product in order to obtain a deduction for research expenses, it did not eliminate the "trade or business" requirement of section 174 altogether. For section 174 to apply, the taxpayer must still be engaged in a trade or business *at some time,* and we must still determine, through an examination of the facts

of each case, whether the taxpayer's activities in connection with a product are sufficiently substantial and regular to constitute a trade or business for purposes of such section.[7] Cf. *Higgins v. Commissioner, supra; International Trading Co. v. Commissioner*, 275 F.2d 578 (7th Cir. 1960), affg. a Memorandum Opinion of this Court; *Ditunno v. Commissioner*, 80 T.C. 362 (1983).

The existence of a profit motive is an important factor because it distinguishes between an enterprise carried on in good faith as a trade or business and an enterprise merely carried on as a hobby. *International Trading Co. v. Commissioner, supra* at 584[8]; see *Snow v. Commissioner*, 416 U.S. at 504. However, the Commissioner's concession that LaSala's activities were profit motivated establishes only the first step in our inquiry; we still must decide whether those activities were such as to constitute a trade or business.

The fact that LaSala carried on its investment activity through a partnership form establishes little. At common law, a partnership is generally defined as an association of two or more persons to carry on, as co-owners, a business for profit (see Uniform Partnership Act sec. 6), but the Internal Revenue Code's definition of a partnership for tax purposes is substantially broader. See secs. 761, 7701(a)(2); sec. 301.7701-3, Proced. & Admin. Regs. In numerous cases, arrangements treated as partnerships for tax purposes were found not to be engaged in a trade or business. See, e.g., *Mitchell v. Commissioner*, 47 T.C. 120 (1966); *Cohen v. Commissioner*, 39 T.C. 886 (1963).

An examination of LaSala's limited activity reveals that it functioned only as a vehicle for injecting risk capital into the development and commercialization of the four inventions. Its activities never surpassed those of an investor. It was not the up-and-coming *business* which section 174 is intended to promote.

---

[7]*Lahr v. Commissioner*, T.C. Memo. 1984–472; *Kilroy v. Commissioner*, T.C. Memo. 1980–489. We also observe that since the Supreme Court's decision in *Snow v. Commissioner*, 416 U.S. 500 (1974), we have withdrawn our support in sec. 162 cases for the goods-and-services test of a trade or business advanced by Justice Frankfurter in *Deputy v. du Pont*, 308 U.S. 488, 499 (1940) (Frankfurter, J., concurring). *Ditunno v. Commissioner*, 80 T.C. 362 (1983); *Groetzinger v. Commissioner*, 82 T.C. 793 (1984), on appeal (7th Cir., Aug. 24, 1984).

[8]*Gyro Engineering Corp. v. Commissioner*, T.C. Memo. 1974–288.

LaSala's activities in 1979, the year for which the section 174 deduction is claimed, were very limited. Reorganized in December 1979 by the substitution of all new partners, LaSala had no history as a trade or business. Its general partner, Tower Hill, likewise had no business history as it had been incorporated just the month before. On December 24, 1979, the partnership executed the acquisition and license agreements which effected the simultaneous purchase and sale of the four inventions in which it was formed to invest.[9] Under the terms of the acquisition agreements, LaSala was obligated to the inventor-sellers to exercise the rights that it acquired and to promote the use and sale of the inventions. LaSala satisfied this obligation by engaging NPDC to develop the inventions into commercially viable products, and by assigning to NPDC all its rights in the underlying inventions subject to the rights of the inventors.

In the years that followed, LaSala's activities were purely ministerial. It maintained a partnership bank account and each year deposited into it the yearly installments due from its limited partners under the terms of the promissory notes by which each partner acquired his interest in the partnership. From the account, LaSala paid the annual recourse installments due the inventors under the acquisition agreements, Tower Hill's management fee, and legal and accounting fees. Employees of Tower Hill also met with representatives of NPDC to discuss the progress of NPDC's development work, but LaSala itself did not conduct any research or experimentation. If the inventions were eventually marketed by NPDC, LaSala would have to collect royalties due under the license agreements and thereafter make further payments to the inventors and distribute any profits left over to its partners. However, LaSala itself would never be able to produce or market the inventions because of the exclusiveness of NPDC's license.

The management of investments is not a trade or business, irrespective of the extent of the investments or the amount of time required to perform the managerial functions. *Higgins v. Commissioner, supra; Moller v. United States,* 721 F.2d 810

---

[9]Any negotiations or planning that led to the execution of the acquisition, R & D, and license agreements appears to have been conducted by the promoters of LaSala, prior to its reorganization.

(Fed. Cir. 1983); *Purvis v. Commissioner*, 530 F.2d 1332 (9th Cir. 1976), affg. per curiam a Memorandum Opinion of this Court. A taxpayer who holds securities for long-term appreciation and who seeks current income from dividends and interest paid on such securities, rather than from frequent short-term trades, is an investor. *Moller v. United States, supra; Purvis v. Commissioner, supra; Liang v. Commissioner*, 23 T.C. 1040 (1955).

LaSala's "royalty" interest in the development and commercialization of the four inventions was analogous to that of an investor in securities. After the transactions of December 24, 1979, LaSala had no ownership interest in the inventions and no control over their actual development, production, or marketing. However, LaSala retained an investor-like interest in such development and commercialization because the purchase price under the license agreements was contingent upon future sales by NPDC. Any proceeds from the sale to NPDC would necessarily be received over the long term, if at all, because of the time required for development.

Furthermore, while this Court has held that the exploitation of inventions through regular licenses and sales may constitute a business (*Avery v. Commissioner*, 47 B.T.A. 538 (1942)), there is no indication in the present case that LaSala intended to buy and sell inventions for profit on a regular basis. Under the terms of its amended limited partnership agreement and according to statements contained in the private offering memorandum distributed to prospective limited partners, the four inventions bought and sold by LaSala in December 1979 were the only inventions in which LaSala would invest. Although there were four inventions, they were acquired and sold in a single, prearranged[10] transaction and therefore may be treated as a single entity. A partnership or joint venture organized to dispose of a single property in an isolated sale, without making substantial improvements to the property between its acquisition and sale, is not in the business of selling property of such kind or character. See, e.g., *Riddell v. Scales*, 406 F.2d 210 (9th Cir. 1969); *Guggenheimer v. Commissioner*, 209 F.2d 362 (2d Cir. 1954), affg. 18 T.C. 81 (1952); *Mitchell v. Commissioner, supra*; cf. *Reese v. Commissioner*,

---

[10]See note 9 *supra.*

615 F.2d 226 (5th Cir. 1980), affg. a Memorandum Opinion of this Court (an individual taxpayer who financed construction of a factory for subsequent sale did not hold factory for sale to customers in the ordinary course of a trade or business); *Buono v. Commissioner*, 74 T.C. 187, 200–201 (1980) (subchapter S corporation which purchased tract of land, subdivided it, and then sold entire tract in a single transaction, was not in the business of selling land).

The petitioners contend that LaSala retained the right to control the research and development of the inventions and that the extent to which LaSala exercised such right is a material issue of fact requiring a trial. The petitioners maintain that LaSala's activities pursuant to such right were in fact sufficiently substantial and continuous to qualify as a trade or business. However, we have already determined that the R & D agreements gave LaSala no right to control NPDC's research activities. That LaSala may in fact have taken an active role in directing the research does not place LaSala in a trade or business. Such activity would be no greater than that of certain shareholders who do not, by devoting their time and energies to a corporation, engage in a trade or business. *Whipple v. Commissioner*, 373 U.S. 193 (1963). As the Supreme Court in *Whipple* observed: "Though such activities may produce income, profit or gain [to the shareholder] in the form of dividends or enhancement in the value of an investment, this return is distinctive to the process of investing and is generated by the successful operation of the corporation's business as distinguished from the trade or business of the taxpayer himself." 373 U.S. at 202. Likewise, in the present case, any income generated by the eventual marketing of the developed inventions, although perhaps redounding to LaSala's benefit, would arise from the business of NPDC, the owner of all rights in the inventions. We therefore conclude that the extent of LaSala's supervision (if any) is not material to the issue before us. ·

Finally, the petitioners rely on *Cleveland v. Commissioner*, 297 F.2d 169 (4th Cir. 1961), revg. in part and affg. in part 34 T.C. 517 (1960). In *Cleveland*, the investor-taxpayer, until 1956, made loans to an inventor to finance the inventor's research and development activities. The Fourth Circuit found that, in such year, the relationship between Mr. Cleveland and

the inventor changed from that of creditor-debtor to become that of equal participants in a joint venture. The joint venture owned the inventions developed by the inventor. The inventor's extensive research activities, conducted on behalf of the joint venture, were therefore attributed to the joint venture. Mr. Cleveland, himself, provided the necessary funds to the venture, negotiated transfers to users of the venture's inventions, and prepared any necessary legal documents. The court found that after the formation of the joint venture, Mr. Cleveland was "engaging with * * * [the inventor] in the trade or business of promoting the commercial development of the invention in which Cleveland was the owner of a participating one-half interest." 297 F.2d at 173–174. Therefore, the court upheld a deduction for Mr. Cleveland's contributions for research made after the formation of the joint venture, but not for the loans made before. 297 F.2d at 174.

The present case is distinguishable from *Cleveland* because LaSala, unlike the joint venture in *Cleveland,* had sold to NPDC all its rights to any product that might result from the research, and after the sale, LaSala, unlike the joint venture in *Cleveland,* was not engaged in the business of developing the product. LaSala would never be able to utilize such product in a trade or business. Compare also *Snow v. Commissioner, supra.* Furthermore, the court in *Cleveland* did not hold that the act of financing research in itself constitutes the trade or business of promoting an invention. The combined activities of both participants in the joint venture formed the basis for the court's finding of a trade or business. See *Cleveland v. Commissioner,* 297 F.2d at 171–172.

Because of our determination that LaSala's research expenditures were not incurred in connection with a trade or business, it is unnecessary for us to determine whether such research was conducted on LaSala's behalf within the meaning of section 1.174–2(a)(2), Income Tax Regs. We hold that the petitioners are not entitled to deduct any partnership losses for 1979 and 1980 attributable to depreciation claimed on the four inventions for those years or attributable to the section 174 deduction claimed in 1979, and we will grant the Commissioner's motion for partial summary judgment.

*An appropriate order will be issued.*