MANN BUSH, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bush v. Commissioner
Docket No. 12642-92
United States Tax Court
T.C. Memo 1994-523; 1994 Tax Ct. Memo LEXIS 531; 68 T.C.M. (CCH) 974; October 18, 1994, Filed *531 Decision will be entered under Rule 155. For petitioner: Steven R. Anderson and Margaret Borison. For respondent: Michael W. Lloyd. GERBER
GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent determined Federal income tax deficiencies for petitioner's 1989 and 1990 tax years in the amounts of $ 12,380 and $ 6,104, respectively. The deficiencies are attributable to respondent's disallowance of Schedule C deductions due, in part, to petitioner's failure to substantiate them and also because respondent determined that petitioner's Schedule C activity was not engaged in for profit within the meaning of section 183. [1] If the activity was engaged in for profit, respondent questions whether certain of the expenditures were ordinary and necessary within the meaning of section 162 and/or whether they constitute startup expenditures within the meaning of section 195. *532 FINDINGS OF FACT [2]
Petitioner resided at Aurora, Colorado, at the time his petition was filed in this case. Since around 1974, petitioner has been employed by Jerrold Communications, a division of General Instrument Corp. involved in the cable television electronics industry. Overall, petitioner had 27 years' experience in that industry. He was involved in the sales and marketing aspects of that industry. During the period under consideration, petitioner's employment required that he travel away from home 80 percent of the time. His annual compensation from Jerrold Communications during the period beginning 1988 through 1992 ranged from a low of $ 81,348.93 to a high of $ 168,111.97. During the years in question, petitioner was about 53 years old, vested in his employer's retirement plan, and not subject to any mandatory age for retirement. Petitioner has had an abiding interest in *533 firearms for most of his life. Prior to 1987, petitioner competed in rifle competitions, was generally oriented toward high-power rifle use, and had gone on safaris to Africa and India for the purpose of hunting big game. Petitioner has also been a member of the Safari Club International, an organization focused on hunting game. In 1987, petitioner became interested in manufacturing specialized bullets for big game hunting and had procured books from David Corbin (Corbin), who owns a company that manufactures bullet-manufacturing equipment for commercial and individual use. Petitioner was interested in bullet manufacture primarily because he hoped to begin a business that he could continue after his retirement from Jerrold Communications. It was his plan to invest capital during his most financially productive years and have a going business when he retired. Petitioner planned to retire about 5 or 6 years from the time he began the bullet-manufacturing activity. He thought that $ 25,000 to $ 40,000 of income from bullet manufacture would sufficiently supplement his retirement income for his purposes. Petitioner expected to sell 30,000 bullets from which he expected $ 30,000 *534 net profit. Under this plan, petitioner would sell the bullet (projectile) and the buyer would provide the cartridge and load the charge. He projected that the development of 150 regular customers who purchased 200 bullets each per year would generate the projected profit. Petitioner also projected that he could manufacture 30,000 bullets in about 3 months. Prior to contacting Corbin, petitioner had no specialized knowledge regarding bullet manufacture. After he received the books, he telephoned people involved in the bullet industry to inquire about the pricing of bullet products. Early in 1988, petitioner purchased, from Corbin, a computer software package for designing bullets. The software enabled petitioner to design and address the technical aspects of bullet manufacture, including size, jacket weights, core weights, and other variances in core and jacket materials. In May 1988, he visited the Corbin factory and ordered bullet-manufacturing equipment (a hydropress and four dies) for about $ 5,000. The equipment was semi-automatic and required manual feeding. Petitioner intended to manufacture the bullet projectile and not the casings. He knew that the type of bullets *535 he intended to manufacture would sell for more than $ 1 and he expected to manufacture and sell about 30,000 per annum. Generally, custom bullets are made using copper tubing which is pinched together on one end and left open on the other and filled with the core material. Petitioner, because of his experience using bullets, preferred to manufacture a "flat nose" bullet because it did not deform during magazine recoil. Petitioner believed that his bullets would be successful if he gained recognition and public awareness for his product. During the period under consideration, while petitioner was still employed in the cable television electronics industry, he spent 8 to 14 weekend hours on his bullet activity. Petitioner designed a logo which coincided with his name -- "Bushmann Hunters and Safaris" -- and obtained a Colorado business license and printed letterhead under that name. Petitioner also filed local business tax returns, despite having had no sales. A Bureau of Alcohol, Tobacco, and Firearms (ATF) license was applied for and initially not obtained due to petitioner's failure to complete the application process. The license was eventually obtained in January 1990. *536 Petitioner opened a bank account and rented a post office box in the name "Bushmann Hunters and Safaris". During the remainder of 1988, petitioner became more proficient in the use of his bullet-manufacturing equipment, and he attempted to perfect a particular style of bullet. In 1989, petitioner began research and development with respect to his bullets by developing different designs and testing them on various materials, including clay, telephone books, plywood, etc. After testing, petitioner discarded some designs and continued to refine his designs working toward a solid copper core bullet with a copper jacket or a laminated bullet. Petitioner was successful in his testing of the laminated design and two other types of bullets. Also in 1989, petitioner attended a safari club convention in Reno, Nevada. That club is composed mainly of professional big game hunters, and the convention is for meeting clients, booking hunts, and mingling. Manufacturers of guns and ammunition attend the convention in order to promote their products. Petitioner attended in order to observe how this was accomplished. He observed that the bullet manufacturers advertised their product by displaying *537 bullets that had been used successfully to shoot big game. Petitioner's attendance at that convention convinced him that his product needed to be tested on big game so that the results could be used in his advertisements. Petitioner booked an African hunt to test his product on large-boned game animals, such as a cape buffalo. Some of his bullets which were successful in laboratory testing failed when used in field testing on big game. On the 21-day safari in 1989, petitioner shot a lion, a kudu, a leopard, and a cape buffalo, and brought back the heads of all but the leopard as trophies. Petitioner concluded that his laminated bullet would have to be scrapped, and he began work on a solid monolithic copper bullet swaged from copper rod. Early in 1990, petitioner booked another African hunting trip, to last 14 days, and he tested the bullets on big game. On this trip petitioner shot cape buffaloes and an impala and brought back one animal head as a trophy. Based on this trip, petitioner found that his solid bullets did not perform in the field as he had expected. Petitioner then decided to swage bullets from solid bronze. In 1991, petitioner continued his work on the bronze *538 bullet, but did not advertise because he was concerned that he might be required to move his residence in connection with his cable television electronics industry job. Petitioner moved from Denver to Dallas in May 1992, and did not do much work regarding the bullet activity for the remainder of 1992. In January 1993, petitioner allowed his ATF license to expire, but it was renewed as of June 1993. Petitioner also experienced a broken wrist during 1992, which limited his ability to operate the bullet-manufacturing equipment. Petitioner did not sell any bullets through the time of trial and has claimed expenses or losses since he began his bullet-manufacturing activity totaling $ 92,637. Petitioner prepared a price list for his bullets and first advertised his product in a specialized magazine during June 1993. The ad did not reference that petitioner's bullets had been field tested. Petitioner attributed his failure to note the field testing to the additional marginal cost factor for including that fact in the ad. Petitioner also asked Corbin to put him in Corbin's guidebook, The World Directory of Custom Bullet Makers. Regarding his bullet-manufacturing activity, petitioner *539 reported no income and claimed losses of $ 39,366 and $ 25,421, for 1989 and 1990, respectively. The amounts and categories of deductions claimed for 1989 and 1990 are as follows: Category
1989
1990
Advertising
$    189
-- Depreciation
1,405
$  2,520
Interest
3,343
3,720
Office expense
-- 123
Repairs and maintenance
-- 135
Supplies
45
114
Taxes
330
46
Travel
7,838
6,612
Meals and entertainment
246
-- Dues and subscriptions
118
76
Shipping (freight)
316
40
Education
315
124
License
30
25
Research and development
25,191
10,860
Total deductions claimed
39,366
24,395
Costs of goods sold
-- 1,026
Total loss from activity
39,366
25,421
Respondent issued a notice of deficiency to petitioner for his 1989 and 1990 tax years on March 13, 1992, and a petition was filed June 9, 1992. In the notice, respondent disallowed all amounts claimed for failure to substantiate the amount and deductibility of the claimed items. In connection with the trial, the parties have reached agreement with respect to the substantiation (but not the deductibility) of all amounts claimed with the exception of the following amounts: (1) 1989 depreciation -- $ *540 79, advertising -- $ 189, travel -- $ 355, meals -- $ 246, shipping -- $ 203, and research and development -- $ 567; (2) 1990 travel -- $ 1,166. ULTIMATE FINDINGS With the exception of the travel and research and development categories, petitioner has not substantiated amounts in excess of the amounts stipulated by the parties. Petitioner incurred research and experimental expenditures in connection with his trade or business of manufacturing bullets during the 1989 and 1990 taxable years. The primary purpose of the safari trips to Africa for 1989 and 1990 was for personal pleasure, and no portion constitutes an ordinary and necessary business expense or is part of his trade or business. Petitioner is entitled to deduct research and development expenses of $ 2,586.56 for 1989 (which includes travel expenses of $ 647.76) and $ 195.02 for 1990 (which is composed solely of travel expenses). The remainder of the expenses claimed are deductible to the extent the amount has been stipulated by the parties and is deductible under section 174. OPINION The parties have presented this case with the central focus upon whether petitioner's activity was one not engaged in for profit as defined *541 in section 183. An "activity not engaged in for profit" is defined by section 183(c) as any activity other than one for which deductions are allowable under section 162 (relating to trade or business expenses), or under paragraphs (1) or (2) of section 212 (relating to expenses for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income). Petitioner claimed a substantial majority of the expenditures in controversy as research and development which could be deductible under section 174. In this regard, section 174 is not referenced in section 183. Section 183 references sections 162 and 212, and those sections have somewhat different threshold standards for deductibility than section 174. During the years under consideration, petitioner was engaged in the early stages of product development, and no sales had been attempted or had occurred; therefore, we have concluded that all of petitioner's activity should be judged under the requirements of section 174. Research and Development -- Section 174 Expenses -- Research and experimental expenditures are defined in section 1.174-2(a)(1), Income Tax *542 Regs., in pertinent part, as follows: expenditures incurred in connection with the taxpayer's trade or business which represent research and development costs in the experimental or laboratory sense. The term includes generally all such costs incident to the development of an experimental or pilot model, a plant process, a product, a formula, an invention, or similar property * * *. The term does not include expenditures such as those for the ordinary testing or inspection of materials or products for quality control or those for efficiency surveys, management studies, consumer surveys, advertising, or promotions. * * *
With the exception of the African safari expenses discussed below, petitioner's activity and claimed deductions for 1989 and 1990 fit within the above definition. Petitioner's plan was to develop a custom or premium bullet-manufacturing business to supplement his income upon retirement. He set out to develop and eventually to market a large caliber, big game bullet with qualities which would attract a specialized premium bullet market. It was expected that it would take about 5 or 6 years for the business income from the bullet sales to be sufficient *543 to supplement petitioner's retirement income. Petitioner believed that he would be in a better capital position during the waning years of his cable television electronics career with his salary in the six-figure range. Knowing that he lacked specialized bullet-manufacturing acumen, petitioner purchased the necessary equipment and began a trial and error process of making specialized premium bullets. Petitioner's extensive firearms experience, including domestic and foreign big game hunting and involvement with safari and hunting organizations and publications, assisted him in his attempt to develop a merchantable product. Petitioner conducted substantial research, including a visit to a bullet machinery manufacturer, and he purchased bullet computer design software, presses, dies, supplies, and related testing materials. He experimented with different shapes and materials, including jacketed and solid projectiles. His approach to developing a merchantable bullet was both scientific and methodical. Petitioner's cable television electronics job consumed most of his time during the week and caused him to travel a large amount of the time. He was able to devote part of his weekends *544 and spare time during the week to develop expertise and bullet-manufacturing technique. Petitioner's early attempts resulted in failures of the product to perform as expected from his predictions based on laboratory testing. Petitioner's progress was also impeded by both his move to another city and a physical injury. Yet, he continued his research and development working toward his goal of a merchantable and profitable product. Petitioner did not and could not attempt to generate any income from the activity prior to his development of a merchantable product. His research and development began in 1987 and continued through 1992 when he believed that he had bullets that would appeal to a specialized portion of the market willing to pay premium prices. It was petitioner's plan to develop about 150 customers, each of whom would purchase about 200 bullets per year. By 1993, petitioner believed that he had a merchantable product and began advertising and attempting to merchandise that product. Petitioner obviously enjoyed hunting and related activities and had more than a passing interest in big game, safaris and related activities. However, petitioner had no need to purchase *545 high-cost technical equipment to make his own bullets merely for his hunting purposes. Although bullet making could be classified as a hobby, we are convinced, on this record, that petitioner intended to make a profit and that it is likely he will at sometime be actively engaged in the business of manufacturing and selling bullets. Respondent argues that various of petitioner's impediments (including lapse of his ATF license, broken wrist, and move) are reasons why petitioner did not or could not make a profit. We find that petitioner was unable to make a profit during 1989 and 1990 because he was continuing to do research and attempting to develop a merchantable product. This aspect of petitioner's activity is not different than any other form of marketing. For example, a salesperson may spend months or even years establishing a customer and ultimate sale. Here, petitioner has spent time developing a product for which customers already exist. We are aware that the market exists because petitioner and the parties' expert witnesses described the market for premium and specialized bullets. Respondent's proffered expert was successful in a specialized bullet-manufacturing operation *546 similar to petitioner's. The failure to sell bullets during the taxable years in issue does not preclude deductibility under section 174. Section 174(a)(1) allows a taxpayer to currently deduct research and experimental expenditures paid or incurred in connection with the taxpayer's trade or business. The Supreme Court has held that research and development costs may be deductible, under section 174, even though there was no product for sale in the year(s) the deductions were claimed. Snow v. Commissioner, 416 U.S. 500 (1974). This Court has concluded that, to be entitled to a deduction under section 174, the taxpayer must be engaged in a trade or business at some time, and its activities must be sufficiently substantial and regular to constitute a trade or business. Green v. Commissioner, 83 T.C. 667, 686-687 (1984). Although there would necessarily be a time lapse before any income could be generated, petitioner entered into and continued his research and development in bullet-manufacturing activity. We find that his expenditures for that purpose (except those for the African trips) were incurred in connection *547 with a trade or business so as to meet the initial threshold for deductibility under section 174. Petitioner claimed various expense categories in connection with his bullet-manufacturing activity. A substantial portion of the total expenses is attributable to the categories for "travel" and "research and development". Of the $ 39,366 claimed for 1989 and $ 25,421 claimed for 1990, $ 33,029 and $ 17,472, respectively, were classified as "travel" or "research and development". Moreover, the transportation costs, safari fee, and related expenses for the African trips make up a substantial portion of the travel and research categories. For example, the round trip airfare to Africa was $ 5,804 and $ 4,967 for 1989 and 1990, respectively. Similarly, the safari fee was $ 15,750 and $ 7,150 for 1989 and 1990, respectively. In addition, there are numerous small items of expense specifically connected with the African safari trips claimed for 1989 and 1990. The remainder of the items in those categories were for research and development and have been allowed in part, as discussed supra. To be entitled to the claimed deductions for the African trips, petitioner would have to show, *548 in accordance with the provisions of section 174, that the expenditures were in connection with a trade or business. Where the primary purpose of a trip is personal, the travel is personal and not in pursuit of the taxpayer's trade or business. Petitioner argues that the primary purpose of the African trips was to field test his bullets on big game. We find petitioner's argument unsupported by the facts and circumstances presented in the record. More specifically, no particular expenditure could be specifically attributable to bullet development. We find that the primary purpose of the safaris was personal. Petitioner, a lifelong gun and hunting enthusiast, had been on safaris and/or big game hunts prior to the two African trips under consideration. He had been a member of an organization that focused on big game hunting prior to his bullet-manufacturing activity. He claims that the purpose of the two trips in question was to field test his bullets on big game. In the perspective of this case, petitioner lost credibility when he testified that he was willing to spend tens of thousands of dollars on safaris and hunting trips, but relatively little or no amount on advertising *549 or marketing. When petitioner first placed an ad in 1993, he was very conservative with respect to the size of the ad and demographics of the chosen magazine. In this connection, we find it most telling that he did not include information about the field testing of his product in the ad. Moreover, he did not take out advertisements in more expensive and broader based publications with larger numbers of potential readers/customers. His willingness to spend relatively large sums on the safari trip is also disproportionate to the potential for profit from the sale of bullets and generally does not comport with the perspective of petitioner's activity. Petitioner did not satisfactorily explain why he did not ask others to field test his bullets. Obviously, this could have provided substantially the same information by their retrieval of the spent bullets at a much smaller cost than he incurred for his own trips to Africa. We are convinced that petitioner's African safaris, including the travel to the safaris and related expenses, were personal expenditures under section 262 and not deductible under sections 162 or 174 and the regulations thereunder. With respect to the remainder *550 of the claimed expenditures, including those for petitioner's attendance at meetings to observe the methodology of marketing his product, we find that they were incurred in connection with his trade or business and deductible within the meaning of section 174. Applicability of Section 195 -- In the alternative, respondent argues that, should this Court find that petitioner was in an activity for profit, his expenditures were startup expenditures and must be capitalized under section 195. Because the allowable deductions for 1989 and 1990 are for research and development, the provisions of section 195 are specifically inapplicable. Secs. 174(a)(1), 195(c). To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the years under consideration, and all Rule references are to this Court's Rules of Practice and Procedure, unless otherwise indicated.↩
2. The parties entered into stipulations of facts with exhibits, which are incorporated into this opinion by this reference.↩