REUBEN ROSENBERG AND MICHELE G. ROSENBERG, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Rosenberg v. Commissioner
Docket No. 8812-83.
United States Tax Court
T.C. Memo 1987-441; 1987 Tax Ct. Memo LEXIS 438; 54 T.C.M. (CCH) 392; T.C.M. (RIA) 87441; August 31, 1987. Paul C. Arshonsky, Marvin Kamensky, and Michael A. Sandberg, for the petitioners. Andrew P. Fradkin, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined deficiencies, and an addition to tax, in petitioners' Federal income tax as follows: Addition to Tax
Taxable Year Ended
Deficiency
Section 6653(a)[1]
December 31, 1979
$ 59,186.00
$ 2,959.00
December 31, 1980
11,307.00
--
After concessions, [2] the issues for determination are: (1) whether petitioners are entitled to claim deductions for research and development expenditures for the taxable years at issue; (2) whether petitioners are liable for an addition to tax for negligence under section 6653(a) for the taxable year 1979; and (3) whether petitioners are liable for additional interest under section 6621(c). [3]
*441 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts, the first supplemental stipulation of facts, and attached exhibits are incorporated herein by this reference. Petitioners resided in Skokie, Illinois, when they filed their petition in this case. Petitioner is a graduate of DePaul University and is a Certified Public Accountant (hereinafter "CPA"). [4] From 1962 through 1977, petitioner was an employee of the Internal Revenue Service (hereinafter "IRS"). Petitioner served as an IRS agent from 1962 through 1979. From 1969 until 1977, petitioner served in management positions at IRS including positions as a training instructor for new IRS agents and as a manager of large case audits. In addition, petitioner taught CPA review courses. In 1977, petitioner joined Engler, Zoghline & Mann, a pension consulting firm which administers and designs profit-sharing and pension plans. During the taxable years at issue, petitioner worked at Engler, Zoghline & Mann. Roger Shiffman (hereinafter "Shiffman") and Edward Jacobson (hereinafter "Jacobson") *442 are individuals who were actively engaged in the toy business prior to and during the taxable years at issue. Prior to 1979, Shiffman was employed at Tiger Electronic Toys, Inc. a subdivision of Interstate Industries. Shiffman has a B.S. in marketing from the University of Illinois and has been involved in the sales and marketing of toys throughout his working career. Jacobson was a senior engineer at Interstate Industries in charge of engineering and manufacturing toy products. In early 1979, while still at Interstate Industries, Shiffman and Jacobson discussed the concept of developing, manufacturing and marketing a hand-held electronic toy called "Mimic", a toy originally conceived of by Jacobson. As a result of this discussion, Shiffman and Jacobson decided to leave Interstate Industries and form their own toy manufacturing business. While Shiffman could market "Mimic" and Jacobson could work on the actual production, funds were needed to perform the research and development necessary to transform "Mimic" from Jacobson's concept into a tangible product. Marvin Kamensky (hereinafter "Kamensky") was an attorney and partner in the firm of Kamensky & Landan. [5] During 1979, *443 Michael Erens, Shiffman's brother-in-law, an attorney practicing at Kamensky & Landan. In early 1979, Shiffman and Jacobson were introduced to Kamensky by Michael Erens. Shiffman and Jacobson attended an initial meeting at Kamensky's home to discuss their proposed toy business. Shiffman and Jacobson were in need of funds. Kamensky was interested in the proposed business and indicated he knew of other individuals who would also be interested in the business. In 1979, Kamensky contacted petitioner concerning an investment opportunity in the production of electronic toys. Petitioner attended a meeting at Kamensky's office where Shiffman and Jacobson presented their toy business proposal. A Preorganization Subscription Agreement and Disclosure Statement (hereinafter the "Subscription Agreement") dated March 14, 1979, states that this investment opportunity involves ownership in two simultaneously-created entities, Koala "T" Toys, Inc. and Electronic Research Associates. Koala "T" Toys, Inc. (hereinafter Koala "T"), an Illinois corporation, was to be formed by the issuance of 100,000 shares of common stock with no par value. *444 In exchange for a capital contribution of $ 700, Shiffman and Jacobson received 70,000 shares of stock. For a capital contribution of $ 50, Kamensky & Landan received 5,000 shares. The remaining 25,000 shares were to be issued to 15 investors in exchange for a capital contribution of $ 10,000. All stock issued was to be placed in a Voting Trust to be voted by Shiffman, the proposed chief executive and operating officer of the corporation. [6]
*445 In addition to organizing Koala "T," the Subscription Agreement contemplates the organization of a general partnership called Electronic Research Associates. The general partners of Electronic Research Associates were to be the stockholders of Koala "T" Toys with the exception of Shiffman and Jacobson. [7]
Finally, the Subscription Agreement states that: 1. It is contemplated that the $ 40,000 invested in the general partnership and then paid to KOALA T TOYS, INC. *446 for research and developmental work to be performed on behalf of the general partnership, should be deductible as an ordinary income tax deduction. 2. It is contemplated that the royalties received by the general partners of ELECTRONIC RESEARCH ASSOCIATES will be taxable at long-term capital gains rate. 3. It is contemplated that in the event the proposed venture were to completely fail, that of the total $ 200,000.00+ invested by the proposed subscribers (comprised of $ 10,000 paid for the common stock of KOALA T TOYS INC., $ 40,000.00+ paid for general partnership interests in ELECTRONIC RESEARCH ASSOCIATES, and the $ 150,000.00 of guarantees for loans to KOALA T TOYS, INC.), all of such amount would be deductible for Federal income tax purposes as ordinary deductions. Electronic Research Associates was forced in March of 1979. The Partnership Agreement states that the purpose of the partnership is to engage "in the development of an electronic toy." The principal office of the partnership is Kamensky's law office. The managing partner is Kamensky who has "authority to bind the partnership in the ordinary course of the partnership's business." As one of 15 general partners, *447 petitioner's percentage interest in the partnership was 6.6667 percent and his capital account was $ 2,666.67. By letter dated June 28, 1979, petitioner learned that since the Preorganization Subscription Agreement and Disclosure Statement dated March 14, 1979, various changes had been made to the corporate structure. [8] Due to these changes, the sale of securities was not in compliance with the Illinois Security Law of 1953 and petitioner was sent an offer of rescission. The offer of rescission was signed by Shiffman as President of Jay-Alden International Group, LTD. (hereinafter "Jay-Alden"). In addition to the letter and offer or rescission, petitioner received a memorandum outlining the modifications to the Preorganization Subscription Agreement and Disclosure Statement. In particular, the memorandum stated: Although it was intended that the proposed Illinois corporation be named KOALA 'T' TOYS, INC., after careful consideration of this matter, by ourselves in consultation with our *448 counsel, Kamensky & Landan, a new more flexible corporate structure was decided upon whereby the following three (3) Illinois corporations were formed. This revised corporate structure now enables us to take advantage of various business opportunities which otherwise may not have been available to us with a single corporate entity. However, you must also be aware that with an increase in business opportunity there is always the possibility of an increase in risk. Accordingly, the failure of one or more of these corporations could have a detrimental effect upon your investment. (i) JAY-ALDEN INTERNATIONAL GROUP, LTD., an Illinois corporation, which has all of the attributes which KOALA 'T' TOYS, INC. was to have had (except as otherwise noted herein), and is in fact the Illinois corporation which you invested in. In addition, JAY-ALDEN INTERNATIONAL GROUP, LTD. caused the formation and owns all of the issued and outstanding no par value common stock of JAYSON INTERNATIONAL, LTD. and KOALA 'T' TOYS, INC. (further discussed in (ii) and (iii) below), both of which are also Illinois corporations. (ii) JAYSON INTERNATIONAL, LTD. is a wholly owned subsidiary, as well as the design *449 and manufacturing arm of JAY-ALDEN INTERNATIONAL GROUP, LTD. (iii) KOALA 'T' TOYS, INC. is a wholly owned subsidiary, as well as the marketing arm of JAY-ALDEN INTERNATIONAL GROUP, LTD.
Of key importance, the memorandum noted that: The information set fourth in * * * the said Preorganization Subscription Agreement and Disclosure Statement relating to the issuance of 8,893 additional shares pro rata to the shareholders other than Roger Shiffman, etc. were changed because of the fact that if the partners of ELECTRONIC RESEARCH ASSOCIATES, an Illinois general partnership, own collectively more than 25% of the issued and outstanding stock of JAY-ALDEN INTERNATIONAL GROUP, LTD., then the royalties received by the partners of said general partnership would be treated as ordinary income and not as capital gain. Accordingly, such provisions were changed as herein below indicated to provide that in the even such $ 50,000 line of credit is used in whole or in part, no additional shares would be issued until January 2, 1984, but that the put price would be increased from $ 800,000 in the aggregate to $ 1,000,000 in the aggregate for all shares owned by the shareholders (including any *450 additional shares issued) other than Roger Shiffman and Edward Jacobson. In this regard, if a shareholder exercises his put prior to January 2, 1984, then such shareholder's right to receive any additional shares because of the utilization of the foregoing line of credit will automatically terminate. Such change was determined to be absolutely necessary by our counsel, Kamensky & Landan to preserve the advantageous tax treatment of the royalties to be received by the partners of ELECTRONIC RESEARCH ASSOCIATES. [Emphasis in original.]
As a result, petitioner and 14 other investors purchased 25 percent of the issued and outstanding stock of Jay-Alden. Shiffman and Jacobson owned the remaining 75 percent of Jay-Alden stock. Petitioner's proportional number of shares was 1,600, representing 1.66 percent of the total stock outstanding. With the exception of Shiffman and Jacobson, the investors in Jay-Alden are the same individuals listed as the 15 general partners of Electronic Research Associates. [9] Shiffman and Jacobson originally estimated sales of "Mimic" at three million dollars. It is unknown upon what data Shiffman and Jacobson relied to reach this figure. Due *451 to production problems, there were only $ 600,000 gross sales of "Mimic" in 1979, and Shiffman and Jacobson determined that more funds were necessary to develop additional electronic toys. [10]
On August 8, 1979, Kamensky sent a letter describing another investment opportunity in Shiffman and Jacobson's toy business to a potential investor. [11] In this letter, Kamensky described the particulars of the investment. *452 Kamensky stated that this investment opportunity would be composed of a group of no more than ten individual investors who would join together as tenants-in-common to develop and market approximately five electronic toys (the investors hereinafter are referred to as the "Venture"). Kamensky stated that the Venture would perfect a patent on each electronic toy and the individual investors as tenants-in-common would hold each patent in their names. According to Kamensky's letter, the Venture would enter into two agreements. First, the Venture would enter into a Research and Development Agreement with Jayson International (hereinafter "Jayson"). In return for compensation of $ 299,000, Jayson would provide the necessary research and development services to develop the electronic toys. Upon completion of the research and development by Jayson, the individual investors, as tenants-in-common for the Venture, would apply for a patent on each product. [12]
*453 Second, the Venture would enter into an exclusive License Agreement with Koala "T" for the exploitation of the patents. According to Kamensky's letter, the term of the License Agreement would be for a period commencing upon the execution of the Agreement and extending until the expiration of any patent associated with the toys. Under the contemplated License Agreement, Koala "T" will pay the Venture an advance minimum royalty of $ 210,000 on March 31, 1980, and royalties of five percent of all toy sales made by Koala "T" through March 31, 1982. The royalty percentage decreases to four percent for sales through March 31, 1983, and bottoms at three percent through the remaining term of the License Agreement. Kamensky's letter states that an investor in this transaction would be required to make a $ 30,000 payment for each unit purchased upon execution of the Research and Development Agreement and the License Agreement. The $ 30,000 payment was required to be made in the form of a certified or bank cashier's check payable to "Kamensky & Landan Special Account." The letter noted that Kamensky & Landan would make arrangements with Harris Trust and Savings Bank, Chicago, Illinois (hereinafter *454 "Harris Trust"), to allow the investor would be required to personally guarantee the loan from Harris Trust. More importantly, Kamensky advised that the following tax consequences of the contemplated transaction should occur: 1. The investor should be able to deduct for Federal income tax purposes, his entire cash investment (cash plus borrowed monies) in his individual Federal income tax return as research and development expenditures for the year 1979. This effectively will give an investor a 2:1 write-off for Federal income tax purposes. 2. The advance minimum royalty of $ 210,000.00 ($ 21,000.00 per investor) should be returned as long-term capital gain for the tax year 1980. 3. On March 31, 1980, the investor will be required to repay his loan at the Harris Trust and Savings Bank together with the applicable interest thereon.
Additionally, Kamensky attached a projection for the Venture's estimated tax benefits to an investor in the 50-percent, 60-percent, or 70-percent tax bracket. On August 15, 1979, petitioner purchased one unit of interest in the Venture. Petitioner invested $ 15,000 cash by a check written to "Kamensky & Landan Special Account." About ten *455 investors, including petitioner, participated in the above research and development investment program. On August 13, 1979, certain individuals (referred to in the agreement as "client" and hereinafter as the "Venture") and Jayson International, Ltd. (hereinafter "Jayson") entered into a Research and Development Agreement (hereinafter "Agreement"). [13] The Agreement states that the Venture is: in the business of developing and marketing computerized amusement devices in accordance with the technical information set forth on the attached Exhibit "B" attached hereto and made a part hereof * * *. Exhibit B which purports to set forth "technical information" is blank. The Agreement states that the property rights in and to the inventions shall *456 be the sole and exclusive property of the investors. On August 13, 1979, the same individuals who entered into the Research and Development Agreement entered into a License Agreement as licensors with Koala "T" Toys, Inc. In the License Agreement, the licensors represented that: they are the exclusive owners of all right, title and interest in the inventions and improvements described and claimed in applications for letters of patent of the United States filed with the United States Patent Office, being more fully described in Exhibit "B" attached hereto and made a part hereof (all of said patents and the inventions hereinafter collectively referred to as the "Product"); * * *.
On Exhibit 'B,' headings appear for the description of the product, the application date for filed patent letters, and the product's serial number; however, there is no information listed under the headings. In the License Agreement, Koala "T" agrees to pay the Venture $ 210,000 for the "exclusive right, license and privilege to manufacture, market and exploit the Product and to grant sublicenses to manufacture, market and exploit the Product." In addition to the $ 210,000 payment payable on March 31, 1980, Koala *457 "T" agrees to pay the Venture a percentage of the product's gross sales according to the following schedule: August 13, 1979
-
March 31, 1982
5%
April 1, 1982
-
March 31, 1983
4%
April 1, 1983
-
Expiration
3%
These funds were to be paid to "Kamensky & Landan Special Account." The term of the Agreement was to last until the later of the expiration of any patents associated with the product or December 31, 1989. [14]
The executed Research and Development Agreement and License Agreement were sent to petitioner on September 27, 1979, by Marc Z. Samotny (hereinafter "Samotny"), an associate at Kamensky & Landan. In an accompanying letter, Samotny noted that Exhibit "B", "Technical Information" for the Research and Development Agreement and Exhibit "B" "Product" for the License Agreement had not been "completed." On March 25, 1980, Shiffman and Jacobson held a meeting with petitioner and other investors. At this *458 meeting, the discussion centered on Koala T's inability to pay the $ 210,000 advance minimum royalty to the Venture. Shiffman and Jacobson had experienced problems marketing "Mimic" and, as a result, sales had not reached their targeted potential. Shiffman and Jacobson determined that more funds were needed to develop additional products. The Venture investors agreed that a paper transfer of funds would take place in which the investors received back their original investment and immediately reinvested the same amount for additional research and development expenditures and an additional deduction on their tax returns. Pursuant to this discussion, a new Research and Development Agreement and new License Agreement were executed on March 26, 1980, between the investors and Koala "T" Toys. [15] These Agreements contain a completed Exhibit "B", Technical Information. [16]
*459 Michael Evans, an attorney at Kamensky & Landan, requested George H. Gerstman (hereinafter "Gerstman") to perform a trademark search to determine the availability of certain trademarks. [17] On June 5, 1980, the U.S. Patent Office received patent applications for four new toy products. Each of the patent application lists Shiffman and Jacobson as co-inventors of the toys. [18] On June 9, 1980, the patents were assigned to certain individuals. [19] In 1981 and 1982, these patents were abandoned. There is no evidence on the record that "Mimic" had a patent or that it was assigned to anyone. *460 By early 1981, Jay-Alden, Jayson, and Koala "T" experienced severe financial and marketing problems. As a result, the companies' assets were liquidated and the proceeds distributed. The Venture neither filed a claim nor received any money from the distribution. On March 26, 1980, Samotny sent petitioner a sample Schedule E, Supplemental Income Schedule, which set forth Samotny's recommendations for deducting the alleged research and development expenditures with respect to Koala "T" Toys. Following Samotny's example, on their 1979 individual income tax return Form 1040, Schedule E, petitioners deducted $ 30,000 in expenses from an entity called "Electronic Toy Products." On their 1980 individual income tax return Form 1040, Schedule E, petitioners deducted $ 23,500 in expenses from Electronic Toy Products. During the years 1979, 1980, and 1981, the accounting firm of Poulos & Bayer performed accounting services to Jay-Alden and its subsidiaries. In addition to preparing financial statements, Anthony Poulos, a partner at Poulos & Bayer prepared Form 1120, U.S. Corporation Income Tax Return, of Koala "T" Toys, Inc. for the fiscal year ending March 31, 1980. The return lists *461 under "other income" research & development income of $ 339,000. Additionally, Koala "T" Toys, Inc.'s return stated that no individual, partnership, corporation, estate or trust owned directly or indirectly 50 percent or more of its voting stock. There is no reference on these returns to Jay-Alden or Jayson. Poulos did not file separate or consolidated returns for Jay-Alden or Jayson. There is no evidence that Electronic Research Associates filed a Form 1065. In his notice of deficiency filed January 24, 1983, respondent disallowed the $ 30,000 and $ 23,500 losses claimed on Schedule E on petitioners' 1979 and 1980 returns. Respondent asserts that the losses are disallowed because petitioners had not substantiated that the entity Electronic Toy Products was engaged in an activity entered into for profit or that the deductible expenses were incurred by the entity in excess of its income. Further, respondent contends that petitioner failed to establish any basis in the entity. OPINION The first issue for decision is whether petitioners are entitled to deductions for their proportionate share of losses in the Venture resulting from claimed research and experimental expenditures *462 by Koala "T" for 1979 and 1980. [20]
Section 174(a)(1) provides, as a general rule, that a taxpayer may elect to "treat research or experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business as expenses which are not chargeable to capital account." Expenditures so treated are deductible in the taxable year in which paid or incurred. The provisions of section 174(a)(1) "apply not only to costs paid or incurred by the taxpayer for research or experimentation undertaken directly by him but also to expenditures paid or incurred for research or *463 experimentation carried on in his behalf by another person or organization (such as a research institute, foundation, engineering company, or similar contractor)." Sec. 1.174-2(a)(2), Income Tax Regs.
Respondent asserts that the Venture was an activity "not engaged in for profit" within the meaning of section 183. Additionally, respondent maintains that petitioner is not entitled to deductions for research and experimental expenses because the Venture did not pay or incur such expenses "in connection with" any trade or business within the meaning of section 174. In contrast, petitioners contend that petitioner entered into this transaction with a profit objective. Moreover, petitioners assert that the investors in the Venture were actively engaged in a trade or business and petitioner is thus entitled to deductions under section 174 for the taxable years in issue. A taxpayer need not currently be producing or selling any product in order to obtain a deduction for research and experimental expenditures. Snow v. Commissioner,416 U.S. 500 (1974), *464 revg. 482 F.2d 1029 (6th Cir. 1973), affg. 58 T.C. 585 (1972). As we observed in Green v. Commissioner,83 T.C. 667, 686-687 (1984), "For section 174 to apply, the taxpayer must still be engaged in a trade or business at some time, and we must still determine, through an examination of the facts of each case, whether the taxpayer's activities in connections with a product are sufficiently substantial and regular to constitute a trade or business for purposes of such section." (Fn. ref. omitted; emphasis in original.) See Drobny v. Commissioner,86 T.C. 1326, 1340 (1986). It is well settled that to constitute a trade or business the activity must be engaged in with an "actual and honest objective of making a profit." Hirsch v. Commissioner,315 F.2d 731, 736 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; Green v. Commissioner,83 T.C. at 687; Flowers v. Commissioner,80 T.C. 914, 931 (1983); Siegel v. Commissioner,78 T.C. 659, 699 (1982); *465 Dreicer v. Commissioner,78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Golanty v. Commissioner,72 T.C. 411, 425 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); Allen v. Commissioner,72 T.C. 28, 33 (1979); Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980); Churchman v. Commissioner,68 T.C. 696, 701 (1977); Jasionowski v. Commissioner,66 T.C. 312, 319 (1976); Benz v. Commissioner,63 T.C. 375, 383 (1974); Bessenyey v. Commissioner,45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). Although a reasonable expectation of profit is not required, the taxpayer must have the intent and objective of realizing a profit. Hirsch v. Commissioner,315 F.2d at 736; Brannen v. Commissioner,78 T.C. 471, 506 (1982), affd. 722 F.2d 695 (11th Cir. 1984); Dreicer v. Commissioner,78 T.C. at 644-645; sec. 1.183-2(a), Income Tax Regs. *466 "Profit" in this context means economic profit, independent of tax savings. Beck v. Commissioner,85 T.C. 557 (1985); Herrick v. Commissioner,85 T.C. 237, 254-255 (1985); Surloff v. Commissioner,81 T.C. 210, 233 (1983). The issue of whether a taxpayer engages in an activity with the requisite objective of making a profit is one of fact to be resolved on the basis of all the facts and circumstances of the case. Hirsch v. Commissioner,315 F.2d at 737; Dreicer v. Commissioner,78 T.C. at 645; Golanty v. Commissioner,72 T.C. at 426; Allen v. Commissioner,72 T.C. at 34; Dunn v. Commissioner,70 T.C. at 720. In making this determination, more weight must be given to the objective facts than to the taxpayer's mere after-the-fact statements of intent. Sec. 1.183-2(a), Income Tax Regs.; Thomas v. Commissioner,84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); Engdahl v. Commissioner,72 T.C. 659, 666 (1979); *467 Churchman v. Commissioner,68 T.C. at 701. Petitioners bear the burden of proving that they possessed the required profit objective. Rule 142(a); see also Boyer v. Commissioner,69 T.C. 521, 537 (1977); Johnson v. Commissioner,59 T.C. 791, 813 (1973), affd. 495 F.2d 1079 (6th Cir. 1974); Sabelis v. Commissioner,37 T.C. 1058, 1062 (1962). The existence of the required profit objective is usually determined by the objective of the entity which has control over the activity under scrutiny. Brannen v. Commissioner,78 T.C. at 504-505; cf. Resnik v. Commissioner,66 T.C. 74, 80-82 (1976), affd. per curiam 555 F.2d 634 (7th Cir. 1977). Thus, the existence of a profit objective of a partnership is determined at the partnership level. Rosenfelf v. Commissioner,82 T.C. 105, 112 (1984); Brannen v. Commissioner,78 T.C. at 504-505; Goodwin v. Commissioner,75 T.C. 424, 434-439 (1980), affd. without opinion *468 691 F.2d 490 (3d Cir. 1982). Such analysis is appropriate because each partner is really engaged in the business of his partnership and, therefore, it is the partnership which exercises control over the activity under scrutiny. Brannen v. Commissioner,78 T.C. at 504-505; Butler v. Commissioner,36 T.C. 1097, 1106-1107 (1961). For similar reasons, the existence of a profit objective of a joint venture is generally determined at the joint venture level. See Drobny v. Commissioner,86 T.C. at 1342; Brannen v. Commissioner,78 T.C. at 504-505; Madison Gas & Electric Co. v. Commissioner,72 T.C. 521, 557-565 (1979), affd. 633 F.2d 512 (7th Cir. 1980); Grove v. Commissioner,54 T.C. 799, 801-805 (1970). Petitioner asserts that he acquired his interest as a tenant-in-common in the Venture. We find that the substance of the transaction before the Court for Federal income tax purposes is that petitioner acquired an interest in a joint venture. Leahy v. Commissioner,87 T.C. 56 (1986). [21] We must, then, decide whether realizing a profit *469 or providing the investors with tax benefits was the predominant objective of the joint venture.[22]
*470 On brief and at trial, petitioner focused on petitioner's profit objective in the transaction before the Court. While recognizing that the determination of a profit objective of a joint venture is determined at the joint venture level, petitioner asserts that as petitioner was the predominant moving force on behalf of the investors in the Venture, the Court must examine his activities on behalf of the Venture. In support of his contention, petitioner points to his alleged expertise in business management upon which Shiffman and Jacobson allegedly relied and the time devoted by petitioner to make the venture a profitable activity. In particular, petitioner points to his alleged negotiations concerning the royalty payments. However, after careful consideration of all the facts in this case, we conclude that the investment program entered into by petitioner was primarily intended to produce tax savings. First, the program was carried on in an unbusinesslike manner. The Venture's activities in 1979 and 1980 were virtually nonexistent. The Venture had no business address. When it was determined that Koala "T" had no funds to pay a minimum royalty to the Venture, a paper trail *471 of transactions was created by which no money was expended but the investors including petitioner were provided with another research and development deduction. In sum, during 1979 and 1980, the Venture had no significant purpose or business activity. Second, while petitioner has invested in a toy manufacturing enterprise before, he first and foremost is an investment specialist and tax expert. [23] Petitioner is a former IRS employee and a CPA, who had been an instructor for the IRS and for a CPA review course. We found petitioner's testimony to be rambling, self-serving, and equivocal to the point of being evasive. Neither petitioner nor Shiffman could recall the relationship of the entities involved in the deal. Likewise, neither understood the deal. While petitioner admitted that he had no actual power in the Venture and that Shiffman and Jacobson were the prime movers, he continually alleged that he had "helped" Shiffman and Jacobson run the toy business. There is no believable evidence on thhe record to convince us that petitioner did anything other than purchase tax benefits. Furthermore, *472 petitioner learned of this investment through Kamensky. Kamensky and his associate, Samotny, directed and controlled the creation of this transaction in its entirety. The testimony of Kamensky serves to reinforce our finding that this was an investment in tax benefits. Kamensky produced no documennts relative to Electronic Research Associates, although he was its managing partner. His testimony was evasive as he could remember few particulars of the deal. Third, neither petitioner nor any of the investors in the Venture had any voice or control in the activities of the toy manufacturing business. In this respect, the Agreements before us are particularly instructive. The Research and Development Agreement dated August 13, 1979, states that the "client" or petitioner and the Venture investors are "in the business of developing and marketing computerized amusement devices in accordance with the technical information set forth on the attached Exhibit 'B'." Pursuant to that Agreement, the Venture allegedly acquired the services of Jayson to perform research and development on the toys. Not only is Jayson's very existence in question but neither petitioner nor the Venture investors *473 are in the business of developing and marketing computerized amusement devices. Furthermore, Exhibit "B" was blank. The License Agreement signed the same date stated that these same individuals were the "exclusive owners of all right, title and interest in the inventions and improvements described and claimed in applications for letters of patent of the United States filed with the United States Patent Office, being more fully described in Exhibit "B." Again, Exhibit 'B'." is blank. In this regard, pursuant to the License Agreement, the Venture allegedly granted to Koala "T" the exclusive right to manufacture and exploit the concepts for the life of the patents. However, none of the individuals owned any rights to any inventions. The patents on four products were not assigned to the investors until June 9, 1980. Under the Research and Development Agreement and the License Agreement, the Venture disbursed all its capital and had no power to direct the research. [24] The only activity left to the Venture was the collection of royalties which were never received. After executing the Agreements, the Venture engaged in purely ministerial acts. Such intentional lack of management *474 clearly indicates that the investors were not concerned with enforcing the terms of the various agreements involved in the program and that the programs were not instituted with a profit objective. On the record before us, the inference is compelling that the investors were simply purchasing tax benefits and not interests in a research and development program. By executing this transaction, Shiffman and Jacobson through Koala "T" obtained financing yet insured that they retained effective control over the development, manufacture and marketing of the electronic toys for their useful life. As passive investors, the Venture participants were assured their tax benefits. When we not that the Venture investors attempted to deduct additional research and development expenditures without paying any money, we can only reach the conclusion on the objective facts that the investment program *475 entered into by petitioner was primarily intended to produce tax saving with little thought to profit objective. It was not the up-and-coming business which section 174 is intended to promote. Green v. Commissioner,83 T.C. at 686-687. [25]
*476 Finally, petitioners rely on Cleveland v. Commissioner,297 F.2d 169 (4th Cir. 1961), revg. in part and affg. in part 34 T.C. 517 (1960). In Cleveland, the court found that after the formation of the joint venture, the taxpayer was "engaging with * * * [the inventor] in the trade or business of promoting the commercial development of the invention in which Cleveland was the owner of a participating one-half interest." 297 F.2d at 173-174. This case is distinguishable from Cleveland because the joint venture before us, unlike the joint venture in Cleveland, was not engaged in the business of developing the product. Furthermore, the court in Cleveland did not hold that the act of financing research in itself constitutes the trade or business of promoting an invention. Rather, the combined activities of both participants in the joint venture formed the basis for the Court's finding of a trade or business. See Green v. Commissioner,83 T.C. at 691. In sum, we are thoroughly persuaded that when Kamensky organized this investment device in 1979, the Venture was never entered into with a profit objective *477 and was never intended to engage in a trade or business at any time in the future. From a close examination of the entire record, we find the Venture was not an activity engaged in for profit. As such, the Venture cannot constitute a trade or business, and petitioner's deduction of his share of the research and development expenditures under section 174 must be denied. Because we find for respondent on the profit objective issue, we do not address the alternative positions advanced by him. We have considered petitioners' other arguments and find them unpersuasive. [26]
*478 We now consider whether petitioner is liable for an addition to tax under section 6653(a) for the taxable year 1979. This section provides for an addition to tax if any part of the underpayment is due to negligence or an intentional disregard of the rules or regulations. Under section 6653(a), negligence is the lack of due care of failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner,85 T.C. 934, 947 (1985.). The burden of proof is on petitioner to establish that he is not liable for the addition to tax. Bixby v. Commissioner,58 T.C. 757, 791 (1972); Rule 142(a). On the record before us, petitioner has failed to introduce any evidence to convince this Court that he was not negligent or did not intentionally disregard rules and regulations. What is particularly egregious in this case is that, as a former IRS agent, petitioner should have been aware of the consequences of his actions. As a result, we sustain respondent's determination as to the addition to tax under section 6653(a) *479 for the taxable year 1979. Finally, respondent also contends that the increased rate of interest under section 6621(c) applies because the research and development expense deductions which petitioner claimed for 1979 and 1980 resulted in a "substantial underpayment" attributable to a tax-motivated transaction. [27]
Section 6621(c) provides for an increase in the rate of interest payable under section 6601 with respect to a "substantial underpayment" (defined as an underpayment in excess of $ 1,000) attributable to a tax-motivated transaction. The increased interest rate applies only with respect to interest accruing after December 31, 1984, even though the transaction was entered into prior to the date of enactment of section 6621(c). Sec. 144(c), Deficit Reduction Act of 1984, Publ L. 98-369, 98 Stat. 682; Stanley Works v. Commissioner,87 T.C. 389 (1986); Solowiejczyk v. Commissioner,85 T.C. 552 (1985), *480 affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). Section 6621(c)(3)(A) enumerates types of transactions which are to be considered "tax motivated transactions." In addition, section 6621(c)(3)(B) provides that the Secretary may prescribe by regulation other types of transactions which shall be treated as "tax-motivated transactions." Sec. 301.6621-2T, Proced. & Admin. Regs. (Temporary), states that any deduction disallowed under section 183, relating to an activity engaged in by an individual that is not engaged in for profit, is deemed to be tax motivated. As we have found that the activity engaged in by petitioner was not entered into for profit, we find that such activity is a tax-motivated transaction. As such, we conclude that respondent is entitled to additional interest after December 31, 1984, on the portion of the deficiency attributable to the disallowed section 174 deduction. See sec. 301.6621-2T, A-4(1), Proced. & Admin. Regs. (Temporary), 49 Fed. Reg. 50390, 50394 (Dec. 28, 1984). See Patin v. Commissioner,88 T.C. 1086 (1987); Solowiejczyk v. Commissioner,85 T.C. at 556. To reflect *481 the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue. All rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. In his notice of deficiency dated January 24, 1983, respondent disallowed petitioners' deduction for losses on Treasury bills taken on petitioners' 19979 1040 individual return. As a result, respondent increased petitioners' taxable income for 1979 by $ 100,822 with respect to this item. On January 14, 1985, the parties stipulated that petitioners are allowed a deduction equal to the amount of their actual cash investment in Treasury bills during the taxable year 1979. As a result, a Rule 155 computation is necessary in this case. ↩
3. Former sec. 6621(d) was redesignated as sec. 6621(c)↩ pursuant to sec. 1511(c), Tax Reform Act of 1986, 100 Stat. 2744. 4. "Petitioner" in the singular from hereinafter refers to Reuben Rosenberg. ↩
5. The firm is now called Kamensky & Rubenstein. ↩
6. The Subscription Agreement states that Koala "T"'s purpose is: To manufacture, purchase or otherwise acquire own, make, export, import, sell, assign and transfer or otherwise dispose of, to invest, trade, deal in and with, goods, services, merchandise, equipment, supplies, commodities, and personal property of every class, nature and description; including but not limited to the manufacturing of all types of electronic toys and hand-held games. To own, operate or lease any office, store, factory or premises in order to provide for the manufacture , production and sale of electronic toys and hand-held games and to provide all services and goods necessary thereto and all other matters for the sale of same. To apply for, obtain, own and otherwise use and deal in trademarks, secret processes, inventions, patents, drawings, licenses, copyrights and the like. To acquire the goodwill, rights, assets and property of any person, firm, association, or corporation and to assume the obligations thereof. To enter into, make and perform contracts of every kind, including but not limited to the purchase and sale and operation of real estate. To borrow or raise money for any of the purposes of the corporation and secure the payment thereof; and to have and exercise all the powers conferred by the laws of the State of Illinois upon corporations. ↩
7. The partnership's purpose is: To acquire and promote certain design patent rights for the production of an electronic hand-held toy, which will then be exclusively licensed to KOALA T TOYS, INC., in exchange for a minimum royalty of $ 10,000.00 per year or 1/2 per cent of gross sales, whichever shall be greater.
According to the Subscription Agreement, the general partners agree to pay cash of $ 40,000 as well as sufficient funds to purchase a $ 1,000,000 yearly renewable term life insurance policy on the life of Shiffman. Additionally, each general partner would be required to guarantee and collateralize his or her proportionate share of $ 150,000 of loans to be made to Koala "T" by the Harris Bank. ↩
8. Although this letter states that petitioner entered into the Preorganization Subscription Agreement and Disclosure Statement on March 26, 1979, there is no signed copy in evidence. ↩
9. On July 26, 1979, investors in Jay-Alden received their Voting Trust Certificates representing each investor's shares of the common stock of Jay-Alden. The unsigned Voting Trust Agreement between Jay-Alden and Shiffman and Jacobson states that the Agreement remained in effect until February 1, 1982. In addition to receiving the voting trust certificate, investors also received the Variable Price Put Option which allowed an investor to sell his or her shares of Jay-Alden back to the corporation at any time after February 1, 1982. ↩
10. "Mimic" was sold to Toys-R-Us and appeared in Bloomingdale's 1980 Christmas Catalog and an industry magazine, JS&A. ↩
11. The letter was addressed to H. Peter Keller who was a general partner in Electronic Research Associates and a stockholder in Jay-Alden. Mr. Keller signed both the Research and Development Agreement and the License Agreement, described infra.↩
12. The letter contemplates that the Venture will pay Jayson's patent attorney $ 1,000 for all legal services rendered with regard to the patent application. The patents were to be issued in the individual names of the investors as tenants-in-common. ↩
13. These individuals are Barbara D'Amato as custodian for Paul D'Amato, Barbara D'Amato as custodian for Brian D'Amato, Howard Robinson, H. Peter Keller, Gerald Habinak, Edward Kaplan, Gerhard Cless, Michael Wasserman, M.D., Charles Janda, M.D., Robert Goodsitt, and petitioner. Of these individuals, only Keller, Janda, Wasserman and petitioner were stockholders in Jay-Alden or were general partners in Electronic Research Associates.↩
14. In the event the License Agreement was not renewed, Koala "T"'s right to manufacture, market and exploit the product shall cease but such termination shall not affect Koala "T"'s right with respect to any outstanding sublicensee. ↩
15. The investors are the same as listed on the original Agreements signed in August, 1979 with the exception that Tony D'Amato is listed on the Agreement. Barbara D'Amato is not a custodian for either Paul or Brian D'Amato. We note that Jayson is no longer the provider of the research and development services. ↩
16. The games to be produced are called: Fast on Your Feet, Touch 'N' Hear Musical Bear, Mini Mind, Multispot [sic] 7, Tuneful Teddy, and Electronic Water Toy. Fast on Your Feet and Touch 'N' Hear Musical Bear appear in the 1980 Bloomingdale's catalog and Multisport 7 appears in the JS&A catalog. ↩
17. Gerstman is a partner in the law firm of Pigott, Gerstman, and Ellis, Ltd. which specialized in matters involving patents and trademarks. Gerstman performed a trademark search of the following names: Pet-Me's, Pet-Em's, Touch and Hear Musical Bear, Fast on Your Feet, Instant Replay, Mini Mind, Flash'N Match, Multisports, Splash Gordon, Movin-Machine. ↩
18. The patent applications were for: TOY NAME
PATENT SERIAL NO.↩
Touch 'N' Hear Musical Bear
157,817
Multi Sport
157,818
Fast on Your Feet
157,819
Mini Mind
157,820
19. Nine of these ten individuals are those individuals who signed the Research and Development Agreement and License Agreement. The tenth individual is Tony D'Amato. The record does not disclose the identity of Tony D'Amato. ↩
20. It should be noted that while petitioner is a stockholder in Jay-Alden and a general partner in Electronic Research Associates, his role in those entities is not at issue in this case. In his notice of deficiency, respondent mentions "Electronic Toy Products" because petitioner deducted research and development expenses from an entity called "Electronic Toy Products." On the record before us, we cannot find any evidence whatsoever of any entity called "Electronic Toy Products." ↩
21. The Venture investors could not be owners as tenants-in-common of the toy concepts and could not transfer these concept rights because there was essentially nothing to own or transfer. Respondent asserts that, for Federal tax purposes, the Venture is a partnership. Sec. 761(a) defines a "partnership" broadly to include "a syndicate, group, pool, joint venture or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title [subtitle], a corporation or a trust or estate." The meaning of thhe term for Federal tax purposes is broader in scope than the meaning of the term at common law. Sec. 1.761-1(a), Income Tax Regs; McManus v. Commissioner,583 F.2d 443 (9th Cir. 1978); Bussing v. Commissioner,88 T.C. 449, 460 (1987). A partnership for Federal income tax purposes is formed when the parties to a venture join together capital with the intent of sharing the profits and/or losses of the venture. Commissioner v. Tower,327 U.S. 280 (1946); Commissioner v. Culbertson,337 U.S. 733 (1949); see also Smith's Estate v. Commissioner,313 F.2d 724 (8th Cir. 1963), affg. on this issue 33 T.C. 465↩ (1959); 1 W. McKee, W. Nelson & R. Whitmore, Federal Taxation of Partnerships and Partners, par. 3.02 (1977). As the substance of this transaction is that the parties are engaged in a joint venture, petitioner and the other investors are in partnership for purposes of Federal income taxation. However, as the existence of profit objective is determined on the partnership or joint venture level, this classification is not central to our determination. 22. Sec. 1.183-2(b), Income Tax Regs., sets forth some of the relevant factors, derived principally from prior case law, which are to be considered in determining whether an activity is engaged in for profit. Boyer v. Commissioner,69 T.C. 521, 537 (1977); Benz v. Commissioner,63 T.C. 375, 382-383 (1974). Such factors include: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Allen v. Commissioner,72 T.C. 28, 33-34↩ (1979). 23. None of the Venture investors were knowledgable about the toy business. ↩
24. The investors' funds were deposited in "Kamensky & Landan Special Account." Kamensky & Landan disbursed the funds to Shiffman and Jacobson. While petitioner did write a check for $ 15,000 to "Kamensky & Landan Special Account," there is no evidence that he paid the total $ 30,000 unit price. ↩
25. Petitioner seeks to distinguish the Venture from the transaction addressed in Green v. Commissioner,83 T.C. 667 (1984). Petitioner states the Green was a "classic tax shelter." However, in the case before us, petitioner, as in Green, attempted to recharacterize a passive investment into a trade or business in order to qualify for deductions under sec. 174. In return for the infusion of $ 300,000 of capital into Jay-Alden, the Venture was to receive a minimum royalty of $ 210,000 some six months later. For each individual investor, an investment of $ 30,000 for a return of $ 21,000 was attractive because each investor deducted $ 30,000 as an ordinary loss in 1979 and characterized the royalty as long-term capital gain in 1980. However, when it became apparent that Jay-Alden could not pay the minimum royalty, the Venture participated in a scheme by which the Venture allowed Jay-Alden to keep the royalty money. By issuing a check to each investor even though no funds existed and by each investor's immediately repaying those "funds" to Jay-Alden, the Venture attempted to generate additional research and development deductions at the "cost" of paying capital gains tax on fictional royalty payments. As such, the deductions which we here disallow are totally uncorrelated to the Congressional purpose underlying sec. 174↩. 26. On brief, petitioner asserts that the capital gain reported by petitioners on their 1980 return was inconsistently treated by respondent. Respondent did not raise this issue in his notice of deficiency and neither party raises this issue in the pleadings. As a result, we will not consider petitioner's argument as this issue was first raised on brief. Rule 34(b)(4); Neely v. Commissioner,85 T.C. 934, 943-944↩ (1985). Moreover, Schedule E of petitioners' tax return for the taxable year 1980 shows no royalty income received under Electronic Toy Products. On Schedule D, we cannot determine from the return if petitioner did in fact report $ 23,500 of long-term capital gain. In this regard, petitioner's assertions that he reported this amount is self-serving and not credible. 27. Inasmuch as respondent has raised this issue in the amended answer, respondent bears the burden of proof. Sec. 6214(a); Rule 142(a); Zirker v. Commissioner,87 T.C. 970, 981↩ (1986).