JOHN MYSLISZ AND LOUISE MYSLISZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; LAWRENCE TAVERNIER AND KAREN TAVERNIER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE
Myslisz v. Commissioner
Docket Nos. 24482-85; 24657-85.[1]
United States Tax Court
T.C. Memo 1988-206; 1988 Tax Ct. Memo LEXIS 237; 55 T.C.M. (CCH) 818; T.C.M. (RIA) 88206; May 9, 1988. Edward J. Fletcher *238 and Stephen A. FitzPatrick, for the petitioners. Margaret A. Satko, for the respondent. TANNEWALD MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined the following deficiencies in petitioners 1981 Federal income tax: Additions to Tax
Petitioner
Deficiency
Sec. 6653(a)(1) [2]
Sec. 6653(a)(2)
John and Louise
50 percent of
Myslisz
$ 4,741.00
$ 237.05
interest due on
underpayment
Lawrence & Karen
50 percent of
Tavernier
6,603.00
330.15
interest due on
underpayment
Respondent also determined that, under section 6621(d), [3] the deficiency was a substantial underpayment attributable to a tax-motivated transaction so that petitioners are liable for interest at 120 percent of the statutory rate. The issue for decision is whether petitioners are entitled to deductions for certain alleged research and experimental expenditures incurred *239 in the course of a computer software development and leasing activity. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated by reference. John and Louise Myslisz are husband and wife and resided in Lincoln Park, Michigan, at the time they filed their petition. Lawrence and Karen Tavernier are husband and wife and resided in Wyandotte, Michigan, at the time they filed their petition. Hereinafter, we will refer to Mrs. Myslisz and Mr. Tavernier collectively as "petitioners." Mr. and Mrs. Myslisz filed a joint Federal income tax return for 1981 dated February 27, 1982, with the Internal Revenue Service Center in Cincinnati, Ohio; Mr. and Mrs. Tavernier filed a joint Federal income tax return for 1981 dated April 5, 1982, also with the Internal Revenue Service Center in Cincinnati, Ohio. Except for their software leasing activity, which was reported on an accrual basis, petitioners filed their returns on a cash receipts and disbursements basis. During *240 1981, Mr. Myslisz was a field supervisor for Frank W. Kerr Co., a drug wholesaler; Mrs. Myslisz was a pension manager for McLouth Steel Corporation; and Mr. Tavernier was a supervisor in the Management Information Group of Detroit Diesel Allison, a division of General Motors Corporation. Only Mr. Tavernier had any knowledge of computers or computer programming. None of petitioners had knowledge of or experience in computer software leasing. For at least 3 years prior to 1981, Russ Soule (Soule) of Data Processing, Inc. (Data Processing) prepared petitioners' Federal income tax returns. Soule and his father, Benjamin Soule, owned Data Processing. Soule had worked for Data Processing since 1967. Soule is not a certified public accountant although he has attended three semesters of accounting classes. In 1981, his experience with computers consisted of one computer programming class and work in programming a computer owned by Data Processing. During the fall of 1980, Data Processing acquired a Point 4 Mark V computer (the computer) to use in preparing Federal and state income tax returns. The computer ran the IRIS operating system. Data Processing also acquired a tax return *241 preparation package from General Computer Services Corporation (GCSC). When it began to use the GCSC package on the computer in January 1981, Data Processing discovered that the GCSC package used batch processing to prepare groups of returns rather than interactive processing to prepare individual returns. Because he believed that there was no packages that could be used to prepare Federal income tax returns interactively using a Point 4 Mark V computer and the IRIS operating system, Soule decided to develop one. Soule organized two corporations as part of the software development project -- Allied Science Projects, Inc. (Applied Science) and U-Compute Centers, Inc. (U-Compute). Articles of incorporation for both were filed with the Michigan Department of Commerce during January 1982. At all times pertinent herein, both were owned by the Soule family. The software package Soule planned to develop was to be made up of several individual programs. In general, each program would calculate an amount for a specific line item on a Form 1040. While each of the programs would be capable of functioning without any of the other programs, the programs were interdependent in that entire *242 package would be necessary to produce a tax return. Soule decided to finance the project by selling the individual programs to investors. The investors were solicited from among Data Processing's clients. Each investor signed a form contract, entitled Software Development Agreement (the Agreement), which was drafted by Soule. Under the Agreement, each investor contracted with Applied Science for the development of a specific program, which Applied Science was to develop or have developed within 270 days of the signing. The Agreement provided that the investor was responsible for marketing the software. [4] Petitioners understood that the programs were interdependent, so that the investors would have to market the entire package. Each of petitioners expected, however, that they would contract with U-Compute to do the marketing. Under the Agreement, a portion of the total contract price was payable upon execution, with the balance due evidenced by an installment note (the Note) payable over 10 years. *243 The Note was, in form, recourse, and bore interest at a rate of 7 percent. In addition, to secure payment of the Note, the Agreement assigned 25 percent of the gross receipts from sale or other exploitation of the program to Applied Science to apply to payments due on the Note, and, in certain circumstances, gave Applied Science the right to market the program. The Notes were not secured by any other property. A total of 20 individuals signed Agreements during 1981 with total contract prices of $ 468,000. Mrs. Myslisz [5] and Mr. Tavernier signed Agreements on December 29, 1981. Mrs. Myslisz's program was to calculate the penalty for early withdrawal of savings. The total price was $ 12,000. Rather than make a cash down payment, Mrs. Myslisz signed a $ 4,000 120-day note, which was paid on May 22, 1982. She signed a 10-year note for the balance of the contract price, with annual payments of $ 1,139.02 due on December 1 of each year. Mr. Tavernier's program was to calculate the IRA deduction. The total contract price was $ 15,000. Rather than make a cash down payment, Mr. Tavernier signed a $ 5,000 120-day note, dated December 29, 1981, which he paid on June 18, 1982. *244 He also signed a 10-year note, with annual payments of 1,423.78, due on December 15 of each year. Both Mrs. Myslisz and Mr. Tavernier accepted, without negotiation, the prices that had been determined by Soule, [6] and neither made any changes in the terms of the form contracts. Reporting on the accrual basis, petitioners deducted the full contract price as research and experimentation expenditures in 1981. [7]
Mr. Tavernier made the payments required by his 10-year note in 1982, 1983 and 1984. He made additional payments on March 22, 1986, and April 6, 1987. [8] Despite the delay in some of the payments, the assignment of gross receipts was never implemented. In addition, no collection *245 actions were ever commenced against either Mrs. Myslisz or Mr. Tavernier. Petitioners received a short description of their programs that did little more than indicate the item on the income tax return that the programs were to prepare. They also were either shown or given schedules showing the tax benefits available for each $ 3,000 invested by an individual in a particular tax bracket. Soule advised petitioners that they would have to be in a trade or business and report the income from the trade of business on an accrual basis if they were to be able to deduct the contract price as research and development expenses in 1981. The schedules outlining the tax benefits contained projections of cash to be received over the life of the investment. [9] These projections showed, for each $ 3,000 invested, annual receipts during the second through sixth years from lease payments of $ 345 and from option [10] payments of $ 100, as well as a final option receipt of $ 1,100 in the seventh year. The cash payments include the one-third down payment in the first year, $ 200 per *246 year in principal payments on the note in the second through sixth years, total interest payments of $ 560 and a final principal payment of $ 1,000 in the seventh year. In summary, over the pertinent period, the cash flows were projected to be as follows: Cash Receipts
Annual Payments
License Fee (5 x 345)
$ 1,725
Options (5 x 100)
500
$ 2,225
Option Payment
1,100
Total
$3,325 Cash Payments
Down Payment
1,000
Principal Payments (5 x 200)
1,000
Interest Payments
560
Final Principal Payment
1,000
Total
3,560 Net Cash
$  (235)
*247 Petitioners received no other projections from Soule or Applied Science as to the amount of income that they could expect to receive, the cost of marketing the programs or the value of the programs. Neither did they consult any outside expert as to the expected income to be derived from exploiting the programs, the costs of marketing or the value of the program. [11] Neither of them knew what other programs to prepare Federal income tax returns were on the market or how their programs were different from those already available. Applied Science contracted with an independent company to do the actual system design work and programming for the package. Work was begun on the system design during November 1981. Because the programmers knew nothing about preparing Federal income tax returns, Soule worked closely with them in developing the package. The end product was an integrated package to prepare individual tax returns, which was completed in August 1982. U-Compute then tested the finished package at no cost to Applied Science. *248 No copyright for the programs has been registered. Neither Mrs. Myslisz nor the investors as a group monitored the programming nor did they have anyone do it for them. Mr. Tavernier individually did make some monitoring effort. Petitioners did receive several form letters indicating the progress being made. The letters were dated the same day and reported progress in identical language. [12] Neither petitioners nor any of the investors monitored the expenditures made by Applied Science. *249 U-Compute signed a license agreement (the License) with each of the investors. The License was a form contract drafted by Soule. In exchange for an annual fee, the License gave U-Compute the right to use the program on U-Compute's computers and to make 10 copies of it for such use. In addition, U-Compute was required to maintain the software, unless the maintenance was due to failure of the investor to discharge his responsibilities, e.g., with respect to correcting program errors. In exchange for a second annual fee, U-Compute was given an option to purchase the program after 5 years (six payments). Neither the License nor the option were transferrable or assignable. On December 3, 1982, Mrs. Myslisz entered into a License with U-Compute. The annual license fee was $ 940, the option fee was six annual payments of $ 400 each and the option price was $ 6,000. On December 10, 1982, Mr. Tavernier signed an identical agreement, except that the annual license fee was $ 1,175, the annual option fee was $ 500 and the option price was $ 8,750. Neither Mrs. Myslisz nor Mr. Tavernier engaged in any negotiations concerning any of the terms of the License. Petitioners made no attempts *250 to market the software other than through U-Compute. U-Compute made the required payments to petitioners for the years 1982 through 1984. It also made late payments to Mr. Tavernier on March 22, 1986, and April 7, 1987. The two late payments made by U-Compute to Mr. Tavernier were identical to the payments made on the same date by Mr. Tavernier to Applied Science. U-Compute's original plan was to market the package through some type of service bureau or walk-in arrangement. Because of prohibitive costs, U-Compute dropped the idea of such an arrangement. U-Compute began to market the program to other users beginning in 1982. [13] Such marketing went beyond the Licenses' terms. The License with Mr. Tavernier was orally modified to allow 100 copies rather than 10 and to change the License fee so that it was the same as the amount due under the Note. Similar modifications were made to the Mrs. Myslisz's agreement. OPINION The first issue for decision is whether petitioners are entitled to a deduction for the claimed research and experimentation expenditures relating to their 1981 contracts for computer software development. *251 Section 174(a) provides that, as a general rule, "A taxpayer may treat research or experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business as expenses which are not chargeable to capital account. The expenditures so treated shall be allowed as a deduction." Section 174(a)(1) applies "not only to costs paid or incurred by the taxpayer for research or experimentation undertaken directly by him but also to expenditures paid or incurred for research or experimentation carried on in his behalf by another person or organization * * * ." Section 1.174-2 (a)(2), Income Tax Regs.
For section 174 to apply, petitioners need not be producing or selling a product in the year in which the deduction is claimed. See Snow v. Commissioner,416 U.S. 500 (1974). The "trade or business" requirement remains in section 174, however, so we must determine whether petitioners were at some time in the trade or business of developing or leasing computer software. This involves determining, through an examination *252 of the facts, whether their activities were "sufficiently substantial and regular to constitute a trade or business for purpose of" that section. See Green v. Commissioner,83 T.C. 667, 686-687 (1984); see also Levin v. Commissioner,87 T.C. 698, 724-725 (1986), affd. 832 F.2d 403 (7th Cir. 1987). As Snow suggests, this also involves, at least as a threshold question, whether petitioners had a profit motive. See 416 U.S. at 504, where the Supreme Court stated "We are invited to explore the treatment of 'hobby-losses' under § 183. But that is far afield of the present inquiry for it is clear that in this case under § 174 the profit motive was the sole drive of the venture." [14]
*253 Profit motive requires that the activity be entered into with an "actual and honest objective of making a profit." Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); see also Drobny v. Commissioner,86 T.C. 1326, 1340 (1986). Although the expectation need not be reasonable, it must be shown that a bona fide objective of making a profit did exist. Taube v. Commissioner,88 T.C. 464, 478-479 (1987). Profit in this context, and as a threshold requirement, [15] means economic profit, independent of tax savings. Drobny v. Commissioner,86 T.C. at 1341. Petitioners' objective is a question of fact to be determined from all the facts and circumstances, Dreicer v. Commissioner,78 T.C. at 645, and they have the burden of proof, Drobny v. Commissioner,86 T.C. at 1341; Rule 142(a). *254 The regulations promulgated under section 183 list nine factors that should be taken into account in determining whether an activity is engaged in for profit. Section 1.183-2(b)(1)-(9), Income Tax Regs. This is intended, however, as only a partial list. Section 1.183-2(b), Income Tax Regs. We see no need to discuss each factor; rather, we will deal with the entire record in the context of the parties' arguments. See Taube v. Commissioner,88 T.C. at 479-481. Petitioners assert that the form of the transaction and their testimony as to their intent when they entered into it show that they had a profit objective. Respondent, on the other hand, contends that the objective facts surrounding the transaction, including petitioners' lack of knowledge, their failure to make reasonable inquiries, the passive nature of their involvement, both before and after the Agreements were signed, and the substance of the debt used to pay for the programs, show that petitioners could not have had the requisite profit objective when entering into the transaction. *255 We agree with respondent. It is well settled that the substance, and not the form, of a transaction controls for Federal income tax purposes. Taube v. Commissioner,88 T.C. at 475. Thus, the facts that petitioners entered into software development agreements and, subsequently, license agreements for the software developed thereunder, do not establish that they were in the trade or business of either developing or licensing software, or both, for the purposes of section 174. Whether they met that trade or business standard depends on the substance of the transaction -- that is, in part, whether those agreements were entered into with the bona fide objective of making a profit. Similarly, the statements in the Agreements that petitioners were in a trade or business, as well as their testimony that they considered themselves to be in a trade or business, do not establish that such was the case. These are statements of subjective intent. While such statements are to be given some consideration in our analysis of profit objective, they must be weighed in the light of *256 all the facts and circumstances, and are to be given less weight than other, objective facts, to which we now turn. Cooper v. Commissioner,88 T.C. 84, 109 (1987); Beck v. Commissioner,85 T.C. 557, 570 (1985). Petitioners had no experience in either software development or leasing when they entered into the transactions. Only Mr. Tavernier had any experience with computer software, and that was in the context of his job with a division of General Motors. While this would, of course, give him some familiarity with the field, we do not think it gave him sufficient expertise to analyze the economics of a small, entreprenurial development and leasing agreement, and petitioners do not contend otherwise. Thus, it is clear that petitioners were dependent on advice they received from others as to how the transaction would work and whether it would be profitable. Despite their lack of knowledge, petitioners failed to make reasonable inquiries concerning the transaction. They did not consult with any outside experts regarding the economics of the transaction, the feasibility of the programming, the individual program's or the entire package's value, *257 the marketing of the package that was to be produced, or the potential competition that then existed. The only advice petitioners received was from Soule, who had an interest in seeing that the transaction was carried out at the highest price possible, because the higher the price the more corporations controlled by him and his family stood to benefit. See Hagler v. Commissioner,86 T.C. 598, 624 (1986), on appeal (11th Cir., Sept. 1986).[16]Inexperience, and the failure to consult experts to allow for inexperience, tends to indicate lack of profit objective. See section 1.183-2(b)(2), Income Tax Regs.
The advice that Soule gave petitioners *258 further indicates that they were not concerned with the economics of the transaction. Most of that advice concerned the tax benefits to be derived, and what petitioners would have to do in order to receive those benefits. The only projections of income shown to petitioners by Soule indicated that, absent tax benefits, the transaction would have a negative cash flow. [17]
Despite these negative projections, *259 petitioners made no attempt to negotiate the price or any other contract items. [18] After the Agreements were executed, they made no attempt to monitor the development of their software. [19] This nearly complete lack of involvement in the transaction tends to indicate that petitioners were not concerned with the economic success of the activity. [20]
*260 Finally, we are persuaded that the debt financing represented by the 10-year Notes was merely a device to increase the tax benefits available. We are convinced that the object of the transaction from the start was for U-Compute to market the program. The cash projections shown to petitioners indicated that they could expect to receive cash from lease payments and from option payments. These cash flows were substantially identical to those that were agreed to under the Agreements with Applied Science and the Licenses with U-Compute (see note 18, supra).This shows that both the marketing agreement and the attendant circular flow of funds, whereby checks were traded between petitioners and two different corporations controlled by the Soule family, were anticipated when petitioners entered into the transaction. Under these circumstances and taking into account all the evidence of record herein, we conclude that the Notes would not have been enforced according to their terms and that petitioners would not have been required to pay the Notes out of their own funds. [21] Such a transaction need not be recognized for tax purposes, and is a further indication that the transaction *261 was entered into to produce tax benefits and not for profit. Cf. Drobny v. Commissioner,86 T.C. at 1346. See also Taube v. Commissioner,88 T.C. at 487 and cases discussed therein.[22]
In summary, based on our analysis of the record as a whole, we find that petitioners did not enter into the transactions involved herein with a profit objective. Therefore, they were not in the trade or business of software leasing or development, and their deductions for research and experimental expenditures are not allowable under section 174. Because of our decision on this issue, we need not consider any *262 of respondent's other arguments, except those relating to the additions to tax. Respondent determined that petitioners are liable for additions to tax under section 6653(a)(1), which provides for an addition to tax when any part of an underpayment "is due to negligence or intentional disregard of rules or regulations * * * ." Section 6653(a)(1). Negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances; petitioners have the burden of proving that they are not liable for the addition. Neely v. Commissioner,85 T.C. 934, 947 (1985); Rule 142(a). Petitioners argue that because they entered into the transaction with a profit motive, they are entitled to the research and experimental expense deductions, so that they were not negligent in claiming them. We have already rejected the premise of the argument, so we need not discuss it further. Petitioners have introduced no evidence that they consulted with anyone other than Soule with respect to the tax effects of this transaction, nor have they introduce *263 any evidence that they had any independent knowledge of those effects. The record shows that petitioners relied solely on Soule's advice. We believe that reliance was misplaced, given Soule's interest in the transaction. Therefore, we hold that petitioners have failed to meet their burden of proof and respondent's determination is sustained. We turn finally to respondent's determination that petitioners are liable under section 6621(c) for interest on the underpayment at 120 percent of the statutory rate. That section provides that additional interest will be due if a "substantial underpayment" (that is, an underpayment of more than $ 1,000) is attributable to a "tax motivated transaction." Certain transactions are deemed to be "tax motivated" by section 6621(c)(3). In addition, the Secretary of the Treasury is given authority to promulgate regulations specifying additional transactions that are to be deemed tax motivated. Section 6621(c)(3)(B). By these regulations, any losses disallowed under section 183 because an activity was not engaged in for profit are attributable to a tax *264 motivated transaction. Section 301.6621-2T, Q-4 & A-4, Temporary Proced. & Admin. Regs., 49 Fed. Reg. 59394 (Dec. 28, 1984). Here, we have found that petitioners entered into this transaction without a profit objective independent of the tax benefits. Therefore, we find that this was a tax motivated transaction, and respondent is entitled to additional interest on the interest accruing after December 31, 1984. See Patin v. Commissioner, 88T.C. 1086, 1129 (1987). [23]
Decision will be entered for the respondent.
Footnotes
1. By order of the Court, dated July 10, 1986, these cases were consolidated for trial, briefing and opinion. ↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Now section 6621(c)↩. Tax Reform Act of 1986, Pub. L. No. 99-514, sec. 1511(c), 100 Stat. 2744. Hereinafter, we use the reference as redesignated. 4. The Agreements also stated that the contractees (petitioners) are "presently in or [are] about to enter into the business of marketing computer software programs * * *." ↩
5. Although Mrs. Myslisz signed the documents, she relied on Mr. Myslisz's advice when she entered into the transaction. ↩
6. Soule determined the contract price for each program by estimating the cost of programming and multiplying that by three to provide for Applied Science's overhead and profit, and for compensation for the tax professionals advising in the development of the package (that is, Soule and his father). ↩
7. Applied Science reported its income using the cash receipts method. ↩
8. The record does not indicate whether Mrs. Myslisz made the payments that were due on her 10-year note. ↩
9. By their terms, the Agreements were to run for 10 years. The license agreements subsequently entered into contained options to purchase. For purposes of the projections, Soule apparently assumed that those options would be exercised in the seventh year of the Agreement, after five sets of annual payments had been made. ↩
10. See page 12, infra, for a description of the options involved, although we note that the projected payments did not coincide with the options as described. See also n. 18, infra.↩
11. Mr. Tavernier did have a lawyer read the Agreement and did speak to several co-workers who had experience in preparing Federal income tax returns. ↩
12. Each April 1, 1982, letter stated: "Design and planning fuctions [sic] to integrate your program into the complete Income Tax Preparation Package have been accomplished. Flow-charting, specifications and programming will commence shortly." Each July 1, 1982, letter stated: "The flow-charting, most specifications, and some programming has been completed. We are rapidly reaching a point at which testing of your program can be done." Each October 1, 1982, letter stated: The testing of your program has been completed by a firm whose principles [sic] have been in the tax preparation field for quite some time. U-Compute Centers, Inc. has requested your name and address in order to negotiate a license for your program. This would seem to indicate that said program has been completed according to the terms of our contract. The final printouts & storage media are available for you to pickup [sic] at our office between the hours of 10:00 A.M. and 4:00 P.M. Monday thru Friday. If you are satisfied with the results of our association, we have additional Tax Program Contracts available. Please call for an appointment and we will discuss them with you. The balance of each letter identified the program owned by the person to whom the letter was addressed. ↩
13. There currently are 24 users of the system. ↩
14. In light of this observation, we think it appropriate to proceed with an analysis under section 183, rather than examine the objective factors in order to determine economic substance as respondent has done, citing Rose v. Commissioner,88 T.C. 386 (1987), on appeal (6th Cir., Dec. 14, 1987). Such being the case, we have no need to determine whether the transactions herein would fall within the definition of a "generic tax shelter" as set forth in Rose. See 88 T.C. at 412-413. We should add that we would reach the same result if we proceeded to adopt the economic substance test of Rose.↩
15. Estate of Baron v. Commissioner,83 T.C. 542, 557-558 (1984), affd. 798 F.2d 65 (2d Cir. 1986). See also Torres v. Commissioner,88 T.C. 702, 729-734 (1987); Carlson v. Commissioner,T.C. Memo. 1987-306↩. 16. Mr. Tavernier consulted a lawyer with regard to the content of the Agreement. He testified, however, that the lawyer did not have any knowledge of the business aspects of the transaction. In addition, Mr. Tavernier consulted several co-workers who had income tax return preparation experience. We do not think that this is sufficient to change our conclusion that he did not make reasonable inquiry. ↩
17. At trial, Soule estimated that 300 to 400 packages could be sold or leased to the 3,000 to 4,000 potential users at approximately $ 2,500 per package, with material and distribution costs of $ 500 per package and marketing costs of $ 10 per potential customer. He also estimated programming costs of the entire package to be $ 300,000, which would give total contract prices of $ 900,000 (see note 6, supra). Using these figures, and assuming 400 packages were sold to 4,000 potential users, the cash flow over the life of the project would be: ↩
Gross Income
$ 1,000,000 Less
Programming Costs
$ 900,000
Distribution Costs
200,000
Marketing Costs
40,000
Total
1,140,000 Net Cash
$  (140,000)
18. The payments to be made under the Agreements and the Licenses largely parallel those indicated in the projections, albeit in slightly different amounts. a comparison of the cash projections and the actual agreements for a $ 15,000 investment reveals the following: Projection
Actual
Down Payment
$ 5,000 $ 5,000 Annual Note Payments (a)
(6 x 1,424)
8,543
Principal (5 x 1,000)
5,000
Interest
2,800
7,800
Note Repayment
5,000
3,736
Total Cash Invested
17,800
17,279
Annual Receipts
Lease (5 x 1,725)
8,625
(6 x 1,l75)
7,050
Option (5 x 500)
2,500
11,125
(6 x 500)  3,000
10,050
Option Price
5,500
5,750
Total Cash Received
16,625
15,800
Net Cash
(1,175)
(1,479)
(a) The projections showed level principal payments and declining interest payments on the notes, the actual Agreement calls for level payments on the Notes. The projections assumed that the options would be exercised and the notes would be paid off after 5 sets of payments; the Agreements called for 6 payments of principal and interest and 6 option payments before the options could be exercised. ↩
19. Although petitioners entered into the transactions in 1981 and software development took place in 1982, we may consider events in years after the years in issue to the extent that those events indicate motive. See Taube v. Commissioner,88 T.C. 464, 482↩ (1987). Mr. Tavernier apparently did make some effort to monitor the development, for example, by telephoning Soule. We do not think these limited efforts are sufficient to change our conclusion that petitioners were passive investors who were concerned primarily with the tax benefits and not the economics of the transaction. 20. The only written communication from Applied Science regarding the software was the series of form "progress" letters sent to petitioners. See note 13, supra.↩ We note, however, that both Mrs. Myslisz and Mr. Tavernier were sent the same letter on the same date, an unlikely occurence if the letters reflected the actual development of different programs, which would probably not occur at a steady pace. 21. Even with respect to the 120-day notes, there is a serious question whether petitioners would be personally liable. The evidence of record indicates that the refunds of taxes for 1981, which were based upon the deductions claimed in respect of the transactions involved herein on returns prepared by Soule, produced funds sufficient to pay off the vast bulk of these notes. ↩
22. The lack of collection activities is a further indication that the Notes should not be recognized. See Porreca v. Commissioner,86 T.C. 821, 840↩ (1986). 23. See also Rosenberg v. Commissioner,T.C. Memo. 1987-441↩.